# STOLZE, by Curator, v. ST. LOUIS TRANSIT COMPANY, Appellant.

### Division One, May 24, 1905.

**EXCESSIVE VERDICT: $15,000: Personal Injuries.** Plaintiff, a barber about eighteen years old, working for three dollars a week and his board and lodging, was injured by the collision of two cars, on one of which he was a passenger. He was taken directly to a hospital and remained there eleven months, under the care of surgeons and nurses. Both legs were broken, and at the trial, which occurred sixteen months after the injury, the right leg had healed; the bones of the other above the ankle were broken in several pieces and some of them came out, and at the trial there was still an opening, and the leg was an inch and a half or two inches shorter than the other; but the bones of the ankle were not broken, and the foot was not injured. The surgeons testified that the leg would in two or three years be so far restored that he would be able to support his body on it and use it for all purposes except jumping, etc., although it would never be as good as it was before. The verdict was for $15,000, and allowing the full amount claimed for medical and hospital services and for loss of earnings of his labor for three years after the trial, the amount would be $3,000, leaving $12,000 for "pain of body and mind he has sustained or will hereafter sustain." *Held,* that the verdict was too large by $7,000.

Appeal from St. Charles Circuit Court.—*Hon. E. M. Hughes,* Judge.

AFFIRMED CONDITIONALLY.

*George W. Easley* with *Boyle, Priest & Lehmann* for appellant.

The damages awarded bear no just proportion to the injuries sustained. They are grossly excessive. In everything except the estimation of the damages for pain, the damages are a mere matter of calculation. Eliminate from the calculation the two thousand dol-

lars in the above excessive estimate, and the actual calculable damages would be less than three thousand dollars, and the remainder of this grossly excessive verdict would have to rest, to the extent of twelve thousand dollars, alone upon the pain of body and mind of plaintiff. It must be the duty of this court to correct so gross an injustice. Furnish v. Railroad, 102 Mo. 438; Burdict v. Railroad, 123 Mo. 236; Chitty v. Railroad, 148 Mo. 82; Kroener v. Railroad, 88 Iowa 16; Railroad v. Dwyer, 36 Kan. 58; Wimber v. Railroad, 114 Iowa 551; Pfeffer v. Railroad, 54 N. Y. 342 (affirmed, 144 N. Y. 636); Railroad v. Hardwick, 53 Ill. App. 161; O'Donnell v. Refining Co., 41 App. Div. (N. Y.) 307; Conway v. Railroad, 51 La. Ann. 146; Morris v. Railroad, 68 Hun 39; Bosworth v. Standard Oil Co., 92 Hun 485; Fordyce v. Moore (Tex. Civ. App.), 22 S. W. 235; Markey v. Railroad, 185 Mo. 348.

*Patrick Leahy* and *A. R. Taylor* for respondent.

(1) There is no effort made by appellate to show, nor is there any evidence in the record tending to show, passion, prejudice and partiality and bias unless it be from the verdict itself. Not a syllable is in the record showing impropriety by word, act or otherwise by the trial court, the jury or counsel for respondent, nor does the record show that on the trial appellant or its counsel were guilty of any impropriety calculated to incite bias or prejudice against it. The forum was neither the home of respondent or appellant, and was therefore presumably unexceptionable in its relation to either. The naked proposition is presented that this court must find there was bias, prejudice and perfidy upon the part of the trial court and jury by reason of the verdict alone, or else appellant has no merit in its appeal. Appellant's brief stands on this ground alone and calls upon the

court to agree with him in his computation as to what would be compensation for physical agony, extending through months and years; what would be compensation for deprivation of the use of his limbs (partial) through life; what will be the loss in his earning power by reason of his inability to have the entire use of his limbs through life, for the evidence shows that whilst he may be able to walk upon one of his legs he will never have full use of both, and will have a permanent limp if he ever gets the use so as to be able to walk on his legs. Counsel argues that the court on an appeal from a verdict of the constitutional triers of these questions may and should set about to determine them in the absence of the witnesses who appeared before the trial court and without seeing, as the jury did, the broken limbs and their appearance at the time of the trial. The only ground on which a court has ever placed its right to disturb a verdict found upon facts by the jury is that the jury was guilty of misconduct in reaching the verdict. They are sworn to try the case fairly and impartially and a true verdict to render. Their obligation is as solemn as that placed upon a court by its official oath. The jury, under the Constitution, is the legal tribunal to try and determine the facts in issue, and it is only when the court can declare that the only solution of the offensive verdict is that the jury were false to their oaths that a right to disturb the verdict arises. Ins. Co. v. Ward, 140 U. S. 91; Railroad v. Winter, 143 U. S. 75; Railroad v. Charles, 51 Fed. 580; Kennedy v. Railroad, 36 Mo. 364; Griffith v. Railroad, 98 Mo. 176; Furnish v. Railroad, 102 Mo. 454; Burr v. Kansas City, 121 Mo. 33; Hollenbeck v. Railroad, 141 Mo. 113; Perrette v. Kansas City, 162 Mo. 253; Newcomb v. Railroad, 182 Mo. 687; Scullin v. Railroad, 184 Mo. 695. (2) The verdict is not excessive, and the jury were guilty of no improper influence in so awarding plaintiff compensation.

BRACE, P. J.—This is an appeal by the defendant from a judgment of the circuit court of St. Charles county in favor of the plaintiff for the sum of $15,000, in an action for damages for personal injuries caused by a collision of two of defendant's cars, on one of which he was a passenger, in which the only error assigned is that the verdict of the jury upon which the judgment was rendered is grossly excessive.

Plaintiff was injured on the 28th of July, 1901, and the trial was on December 10, 1902. It appears from the evidence that at the time of the collision the plaintiff was about eighteen years and six months old; that he was a barber by trade; that he was working for three dollars a week, his board and washing; that directly after his injury he was taken to a hospital and remained there under surgical treatment for eleven months. The hospital charges were $5 a week, and the charges for surgical and medical service were $500. Dr. Lutz, the physician who attended him in the hospital and who was introduced by the plaintiff, testified as follows as to the character and extent of his injuries:

"Q. Doctor, did you ever have occasion to treat the plaintiff, John Stolze? A. Yes, sir; I treated him for fractures of both legs.

"Q. Describe to the jury the fractures you found on his legs? A. Well, he had on the right leg an open compound fracture, and on the left leg he suffered from a compound comminuted fracture; that means that the bone was broken into several pieces on the left leg.

"Q. Do you remember whether the bones of the right leg came out? A. No; they did not, but there was an opening through the skin, which constituted a compound or open fracture, but on the left leg the bones protruded through the skin.

"Q. But I mean since, in the healing process, have bones come out of both legs? A. Well, I wouldn't like to say positively about the right leg, but a part of the bone died on the left leg and came out since.

"Q. How long did you continue to treat him? A. Practically all the time he was at the hospital. . . .

"A. He suffered a very considerable amount of pain, as is ordinary in cases of fracture of that character; suffered very considerable pain, for which it was necessary to administer anodynes, more particularly in the shape of morphine.

"Q. How long did these keen or agonizing pains continue? A. For several months.

"Q. Doctor, as a result of these injuries, how is his left limb affected as to its length? A. It's shorter, I judge, say, an inch and a quarter, perhaps a little more; it's fully that much shorter. . . .

"Q. Is there any use or flexibility of the ankle? A. The ankle is, as we call it, anchylosed, which means stiffened and almost immobile; it can hardly be moved.

"Q. He says his wound was open within a week; what do you attribute that fact to? A. That some part of the bone is still being cast off—still inflamed, and is being thrown out by nature.

"Q. Will there ever be a time when he can use that foot, in your opinion? A. I think so; I think it will continue to improve.

"Q. What do you say about his recovering the entire use of it?

"The Court: Speaking of the left leg?

"Mr. Taylor: Yes, sir; the left leg.

"A. The entire use of it, as compared with the limb if it had not been injured; of course, his leg will never be better than it was before it was hurt, but I imagine that, with the course of time, the function, the use of the limb for practical purposes, will be restored; I don't wish that to mean that it will ever be like it would have been had it never been hurt. . . .

"Q. This anchylosis, will that continue? A. I think, as a result of use, experience, it will improve, but I don't think it will ever be as supple and movable as a normal limb; I think the nature of the wound pre-

cludes the re-establishment of the entire function of that joint.''

On cross-examination the doctor testified, in substance, that the leg would improve so that he could walk on it without cane or crutches, but that it would be weaker than a normal leg and sensitive to changes in atmospheric conditions, and that he would never be able to jump or run actively on it.

Dr. Stumberg, called for the defendant, testified as follows:

''Q. State to the jury how you came to examine the leg? A. The young man came into the office of Dr. Mudd and myself, and Mr. Taylor came with him, and they asked me to examine the leg; Dr. Mudd came in and we examined the leg.

''Q. Now from your examination of that leg, what would you say in regard to this young man regaining the use of that leg? A. Well, I found in the case a compound fracture in the right leg, which has entirely recovered, that's good cure; the left leg was—he had sustained a compound and comminuted fracture with the bones protruding, and the recovery in such a case is very slow; some of the bones I guess have come out; there is still a slight opening; the process of healing, however, has so far proceeded that the union now is formed.

''Q. What do you say in regard to that young man regaining the use of the leg so he can walk on it? A. Well, there is some shortening but the use will be pretty fair; he will be able to support his body on it and the shortening is not so great.

''Q. In what time will he be able to walk on it? A. I think in a year or so, perhaps in less; the full use of the leg will not be regained, however, for maybe longer than that, maybe two years.

''Q. In what time do you think that young man will regain full use of his leg for all practical purposes, to walk on and use the leg in a useful manner?

A. Well, to make a fair allowance, I should say about three years, to make a perfectly fair allowance for him.''

On cross-examination:

''Q. Didn't you, when you examined the boy, tell him you didn't think he would be able to use his foot for about four years or five? A. I might have said four years; I want to be perfectly fair, and it's hard to tell exactly; nature will sometimes in a young and healthy man do wonders in two years, and sometimes it might take a little longer.

''Q. When you say it will be restored to use, you mean by that he can make use of it to bear his weight on it and walk some? A. Yes, sir.

''Q. He will never be able to run or jump actively with that foot as long as he lives? A. No, sir; it will never be as good as it was before.''

Dr. Mudd, also called for the defendant, testified as follows:

''Q. Did you have occasion to examine the limb of this young man Stolze, the leg? A. I saw his leg; yes, sir.

''Q. What would you say in regard to that young man regaining the use of that leg for all practical purposes? A. Well, I would judge that he would in time, in the course of a few years, would gain sufficient strength for practical purposes.

''Q. To walk on? A. To walk on; yes, sir; I think there will always be a slight limp, a shortening there that will cause a limp, but that will even improve; the pelvis will adjust itself so as to do away with the shortening to a great extent.

''Q. Doctor, the ankle of this young man's leg wasn't injured, I mean the ankle joint? A. I don't think the fracture, as we could discover it, involved the joint.

''Q. The leg was broken up here? A. Up above the joint.

"Q. This leg being stiff, and not being injured from the collision, what would necessitate stiffness of that at the present time? A. Well, in the inflammation that followed the injury the shift of the muscles was all thickened, the tendons are all thickened, and caused a thickened synovial membrane.

"Q. Would the disuse of that joint bring about the stiffening? A. Yes, sir, to a certain extent it would.

"Q. By the use of the ankle after the bone had thoroughly healed will the ankle regain its normal functions? A. That will improve; yes, sir; it will improve."

Cross-examination by Mr. Taylor:

"Q. This leg is still discharging broken bone according to the testimony? A. Yes.

"Q. Could you tell from any observation you made when that will cease the discharge of the bone? A. It would be very hard to tell exactly when it will cease, but judging from the external parts there's but small portions remaining to be discharged; there could not be any large surface there, it would show a greater opening."

Redirect examination by Mr. Bruere:

"Q. Doctor, the foot of this young man will never be deformed any way, will it? A. I hardly think so.

"Q. The foot itself wasn't injured, was it? A. No, sir; the foot wasn't injured at all."

The plaintiff testified that he started to work at his trade when he was fourteen years old; that he can walk a step or two on his left leg; that it hurts when he steps on it; that it is nearly two inches shorter than the other leg; that the ankle is stiff; that some bone came out of the right leg and that it is bent; that he suffered intensely for three or four months, when the pain got easier; that he suffers pain in both legs in cloudy and damp weather; that he never was sick in his life; is healthy and weighs 174 pounds; can use his

right leg all right; can bear some weight but hardly any on the left; and it is getting better.

At the request of the plaintiff the court instructed the jury as follows:

"If the jury find for the plaintiff they should assess his damages at such sum as they believe from the evidence will be a fair compensation to him:

"1st. For any pain of body or mind which the jury may believe from the evidence he has sustained or will hereafter sustain by reason of his injuries and directly caused thereby;

"2d. For any loss of the earnings of his labor which the jury may believe from the evidence the plaintiff has sustained or will hereafter sustain by reason of his said injuries and directly caused thereby;

"3d. For any expenses necessarily incurred for medical or surgical attention and nursing, which the jury may believe from the evidence the plaintiff has incurred or will hereafter incur by reason of said injuries and directly caused thereby." ·

Under the third paragraph of the instruction, the jury might well have assessed the plaintiff's damages at $735; $235 for hospital expenses, and $500 for surgical and medical service. Under the second, the assessment could not have well exceeded $2,160, or $40 a month for four years and a half, that period including one year and a half from the date of the accident to the date of the trial and three years thereafter; by which time, as the evidence tends strongly to prove, he would have been so restored as to be able to return regularly to work at his trade. So that, making the most liberal calculation in favor of the plaintiff, the jury could not well have allowed him more than $3,000 under these two paragraphs of the instruction, and the remaining $12,000 of the verdict must have been given under the first paragraph. After analyzing this evidence and again examining the long line of precedents on this subject, many of which are cited

in the recent case of Chitty v. Railroad, 166 Mo. 435, we are confirmed in the conviction, which struck us at first blush, that this verdict is excessive; and, if anything like uniformity and a standard of fairness is to be preserved in this class of cases, this judgment ought to be reduced. A verdict for $8,000 would have been a liberal one in this case, hence the judgment of the circuit court will be affirmed only on condition that plaintiff enter a remittitur of $7,000 within ten days; otherwise, the judgment of the circuit court will be reversed and the cause remanded for a new trial.

All concur, except *Marshall, J.,* not sitting.