# DEVOY v. ST. LOUIS TRANSIT· COMPANY, Appellant.

### Division One, December 21, 1905.

1. **INSTRUCTIONS: Models.** Plaintiff's instructions in this case, which is an action for damages for personal injuries charged to be due to defendant's negligence in operating a street car, are commended as models of simplicity, legal precision and comprehensiveness.

2. **NEGLIGENCE: Relation of Passenger and Carrier: Stopping Car: Conductor and Motorman Not Seen: Degree of Care.** Before an instruction exacting of a carrier the high degree of care which a carrier owes·a passenger can be properly given, the relation of carrier and passenger must be shown to exist. And where the plaintiff went to the street corner, and standing in the light where he could have been easily seen, signaled an approaching car to stop, and it did so, and he thereupon attempted to board it, taking hold of the hand-hold, placing one foot on the platform step, and just then without warning the car suddenly started forward, throwing him to the granite pavement, no conductor or motorman being seen while plaintiff was attempting to get on or when he signaled the car to stop or when it stopped, defendant offering no evidence, there was a sufficient showing to authorize the jury to find that the relation of carrier and passenger existed, and to authorize an instruction holding the defendant liable for the injury sustained.

3. ———: ———: **On Car Steps.** The law deems the relation of carrier and passenger to exist where one has signaled a street car to stop and it does stop and he is properly on the steps of the car entering it as a passenger.

4. **NEW TRIAL: New Evidence: Diligence.** Diligence is a primary condition precedent to the granting of a new trial on the ground of newly-discovered evidence. And where the petition and the facts of the case developed at the trial reveal that a certain person would likely know of the facts in issue, and could easily have been procured at the trial, or at least subpoenaed, and no showing is made why he was not subpoenaed or his deposition taken, a new trial will not be granted on the filing of an affidavit in which he makes statements contradictory of plaintiff's testimony.

5. ———: ———: **Different Result.** Where the newly-discovered evidence would not likely produce a different result, owing to the overwhelming character of the testimony on the point, a new trial should not be granted.

Devoy v. St. Louis Transit Co.

6. ————: **Prejudice: Impeachment of Verdict by Juror.** Courts do not look with favor upon the affidavit of a juror that the verdict was the result of prejudice on the part of the jurors making it, in that they brought forward and discussed in the jury room certain other acts of appellant's misconduct and thereby were inflamed to render the verdict they did.

7. ————: **Motion to Take Depositions After Trial.** Under extraordinary circumstances appealing to the discretion of the trial court, it may allow a motion to take depositions filed by the losing party claiming that the verdict was based upon false testimony and fraudulent malingering of the plaintiff, when the motion shows that voluntary affidavits cannot be obtained. But it is a practice not to be encouraged and when not timely made should be denied; and when the circumstances reveal no good reason why the defeated party did not bring forward the countervailing testimony at the trial, the motion should also be denied.

8. **WITNESS: Refusal to Disclose Name.** In the absence of a statute requiring parties litigant to voluntarily disclose the names of witnesses, a refusal to do so is not reversible error. Under proper circumstances, the refusal to disclose the names of witnesses may go to the jury for what it is worth on the question of good faith or a simulated claim.

9. **EXCESSIVE VERDICT.** A heavy verdict challenges the court's sharpest scrutiny.

10. ———— **Actual Damages.** In a suit for damages for personal injuries, brought against a street railway for neglect of care toward a passenger, where no punitive damages are asked for and there is no allegation that the injury was accompanied by malice and willfulness, the award must be limited to the actual damages sustained.

11. ————: ————: **$15,000.** The elements of plaintiff's damage were loss of income, medical outlays, pain and physical infirmity. He was seventy years of age, was an attorney at law and had been for many years. He did not appear in court, but engaged in preparing cases for trial and settling them. How much his income was is largely a matter of conjecture, and whatever it was has been wholly lost. He had spent $150 for medical services. He sustained incidental bruises which in the course of two months disappeared. His chief injury was a fractured thigh bone, from the effects of which he must go about on crutches, and will be permanently lame. *Held*, that a verdict of $15,000 was excessive by $5,000.

Appeal from St. Louis City Circuit Court.—*Hon. Warwick Hough,* Judge.

AFFIRMED ON CONDITION.

*Boyle & Priest, George W. Easley, Edward T. Miller* and *J. W. Jamison* for appellant.

(1) Plaintiff could only recover on the cause of action and for the negligence specified in his petition. Hutson v. Taylor, 140 Mo. 263; Barclay v. Railroad, 148 Mo. 124; Pryor v. Railroad, 85 Mo. App. 367; Raming v. Railroad, 137 Mo. 506; Hite v. Railroad, 130 Mo. 136. (2) The relation of passenger and carrier can be created only by contract, express or implied. Schepers v. Railroad, 126 Mo. 665; Schaefer v. Railroad, 128 Mo. 64. (3) Under the pleadings and all the evidence plaintiff was not entitled to recover. Jackson v. Railroad, 118 Mo. 199; Neville v. Railroad, 158 Mo. 293; Pryor v. Railroad, 85 Mo. App. 367; Bachrach v. Railroad, 54 N. Y. Supp. 958; Kohler v. Railroad, 99 Wis. 33; Railroad v. Mills, 105 Ills. 63; Nellis, Str. Surf. Railroads, p. 484. (4) The court committed error in giving to the jury plaintiff's instruction 1. (5) The court erred in denying defendant's application for the appointment of a special commissioner to take depositions. Sec. 800, R. S. 1899; State v. Murry, 91 Mo. 95; State v. Bailey, 94 Mo. 311; State v. Wheeler, 94 Mo. 252; Howland v. Reeves, 25 Mo. App. 458; Parker v. Hardy, 24 Pick. (Mass.) 246; 14 Enc. P. & P., p. 790, 903. (6) The verdict is grossly excessive. Stolze v. Railroad, 87 S. W. 517; Chitty v. Railroad, 166 Mo. 443; Nicholds v. Plate Glass Co., 126 Mo. 68; Rodney v. Railroad, 127 Mo. 68; Waldheir v. Railroad, 87 Mo. 37; Hollenbeck v. Railroad, 141 Mo. 112; Furnish v. Railroad, 102 Mo. 438; Gurley v. Railroad, 104 Mo. 211; Burdict v. Railroad, 123 Mo. 1.

*Seneca N. & S. C. Taylor* and *Hamilton Grover* for respondent.

(1)   (a) When a car stops pursuant to a signal by a passenger, and the latter has one foot on the step of the platform intending to become a passenger, he has by such act become a passenger.  Cobb v. Railroad, 149 Mo. 145; Barth v. Railroad, 142 Mo. 549; Schepers v. Railroad, 126 Mo. 673; Stoddard v. Railroad, 105 Mo. App. 520; Meriwether v. Railroad, 45 Mo. App. 528; Gaffney v. Railroad, 81 Minn. 459; Merle v. Railroad, 66 Minn. 459; Steeg v. Railroad, 50 Minn. 149; Smith v. Railroad, 32 Minn. 1; Railroad v. Burgess, 200 Ill. 628; Railroad v. James, 69 Ill. App. 609; Railroad v. Craig, 57 Ill. App. 41; Railroad v. Duggan, 45 Ill. App. 450; Railroad v. Cook, 43 Ill. App. 634; Conners v. Railroad, 105 Ind. 62; Railroad v. Jolly, 67 N. E. 937; Davey v. Railroad, 177 Mass. 106; Gordon v. Railroad, 175 Mass. 181; Geddens v. Railroad, 103 Mass. 391; Railroad v. Smith, 74 Md. 212; Akersloot v. Railroad, 15 L. R. A. 489; Holmes v. Railroad, 153 Pa. St. 152; Clark's Accident Law, pp. 4-7; Booth on Street Railway Law, sec. 326.  (b)  The act of stopping a street car on being signaled is an invitation to would-be passengers to board the car, and is an invitation not only to the person who signaled the car to stop but to others who desire to board the car. Schepers v. Railroad, 126 Mo. 665; Gaffney v. Railroad, 81 Minn. 459; Railroad v. Duggan, 45 Ill. App. 450; Railroad v. Cook, 43 Ill. App. 634. (2) It is well settled that a person does not have to be actually on a street car before he becomes entitled to the rights of a passenger.  If the car has been stopped on being signaled and he is in the act of getting aboard when the car starts, the relation of carrier and passenger is held to be established.  Barth v. Railroad, 142 Mo. 549; Schepers v. Railroad, 126 Mo. 665; Reynolds v. Railroad, 92 Va. 400; Tucker v. Railroad, 77 Ga. 61; Railroad v. James, 69 Ill. App. 609;

Railroad v. Cook, 43 Ill. App. 634; Railroad v. Jolly, 67 N. E. 935; Davey v. Railroad, 177 Mass. 106; Gordon v. Railroad, 175 Mass. 181; Gaffney v. Railroad, 81 Minn. 459; Miller v. Railroad, 66 Minn. 192; Smith v. Railroad, 32 Minn. 1. (3) A common carrier of passengers is bound to allow its passengers reasonable time to enter and leave its cars, and while it may start before a passenger has been seated, it must exercise the highest degree of care that prudent and cautious persons would use and exercise under similar circumstances, in starting its cars so as not to suddenly jerk or jar him, and thereby injure him. Grace v. Railroad, 156 Mo. 295; Cobb v. Railroad, 149 Mo. 135; Barth v. Railroad, 142 Mo. 550; Smith v. Railroad, 108 Mo. 243; Furnish v. Railroad, 102 Mo. 438. (4) It is negligence *per se* for those operating street railroads to start the car forward with a lurch while a passenger is in the act of getting on the same. Cobb v. Railroad, 149 Mo. 136; Barth v. Railroad, 142 Mo. 536; Schepers v. Railroad, 126 Mo. 673; Railroad v. Smith, 21 Atl. 706; Akersloot v. Railroad, 131 N. Y. 599; Sling v. Railroad, 52 N. W. 395; Davey v. Railroad, 177 Mass. 106; Geddens v. Railroad, 103 Mass. 391; Railroad v. James. 69 Ill. App. 611; Brien v. Bennett, 8 Car. & P. 724; Booth on Street Railways, sec. 326; Clark's Accident Law (Street Railways), sec. 3, pp. 4, 5, 6. (5) (a) Litigants will be confined to the course they have taken throughout the trial, even though that course may be inconsistent with that of the pleadings. State to use, etc., v. O'Neil, 151 Mo. 67; Fearey v. O'Neil, 149 Mo. 467; Crossland v. Admire, 149 Mo. 650; Benne v. Miller, 149 Mo. 228; Berkson v. Railroad, 144 Mo. 211; Stewart v. Outhwaite, 141 Mo. 562; Hill v. Drug Co., 140 Mo. 433; Hall v. Goodnight, 138 Mo. 576. (b) Where the defeated party asks instructions not at variance with the theory asked by the winning party, he cannot complain of the latter's instructions as a departure. Christian v. Ins. Co., 143 Mo. 460; Snowden v.

Kessler, 76 Mo. App. 581. (6) (a) Jurors are not permitted to impeach the verdict by their own affidavits or evidence. Pratte v. Coffman, 33 Mo. 71; State v. Underwood, 57 Mo. 40; State v. Branstetter, 65 Mo. 149; State v. Fox, 79 Mo. 112; State v. Rush, 95 Mo. 199; State v. McNamara, 100 Mo. 101; State v. Dusenberry, 112 Mo. 295; Easley v. Railroad, 113 Mo. 247; State v. Schaefer, 116 Mo. 107. (b) But the affidavits of jurors may be received to explain or contradict evidence, tending to impeach the verdict. State v. Underwood, 57 Mo. 52; State v. Fox, 79 Mo. 112; State v. Rush, 95 Mo. 206; Woodward v. Loevy, 107 Mass. 453. (7) The court did not err in denying defendant's application for the appointment of a roving commissioner to find evidence tending to support appellant's motion for a new trial. If any such evidence existed, it should have used a reasonable effort to obtain the same before the trial, but it used none. Moreover, it should have presented affidavits of persons who knew facts of their own knowledge stating under oath such facts as they could swear to if a new trial were granted. Such it did not present, except Nay's, and his, the record undeniably shows, was false; and the juror, Bearden's, and his was incompetent; but if competent, his is contradicted by seven jurors, and is obviously false also. State v. Flutcher, 166 Mo. 582; Mirrielees v. Railroad, 163 Mo. 470; Schmitt v. Railroad, 160 Mo. 43; State v. Norman, 159 Mo. 531; State v. Tate, 156 Mo. 119; Kuenzel v. Stevens, 155 Mo. 280; State v. Bybee, 149 Mo. 632; Bank v. Porter, 148 Mo. 183; Folding Bed Co. v. Railroad, 148 Mo. 478; State v. Lucas, 147 Mo. 70; State v. Miller, 144 Mo. 26; State v. Tomasitz, 144 Mo. 86; State v. Williams, 141 Mo. 316; State v. Sansone, 116 Mo. 1; State v. Potter, 108 Mo. 424; Cook v. Railroad, 56 Mo. 380; Hesse v. Seyp, 88 Mo. App. 66; Madden v. Realty Co., 75 Mo. App. 358; Coal Co. v. Railroad, 10

Mo. App. 597; 14 Ency. Plead. & Prac. 905. (8) (a) In State v. McKenzie, 177 Mo. 716, it is held that the party must show, first, that the evidence has come to his knowledge since the trial; second, that it was not owing to the want of due diligence that it did not come sooner; third, that it is so material that it would probably produce a different result if the new trial were granted; fourth, that it is not cumulative only; fifth, that the affidavit of the witness himself should be produced, or its absence accounted for; and, sixth, that the object of the testimony is not merely to impeach the character or credit of a witness. The following cases are to the same effect: State v. Carpenter, 182 Mo. 53; Schmitt v. Railroad, 160 Mo. 45; State v. Bybee, 149 Mo. 632; Folding Bed Co. v. Railroad, 148 Mo. 485; State v. Tomasitz, 144 Mo. 86; State v. Miller, 144 Mo. 26; State v. Welsor, 117 Mo. 571; Mayor of Liberty v. Burns, 114 Mo. 433; Shotwell v. McElhinney, 101 Mo. 683; State v. Musick, 101 Mo. 260; State v. Crawford, 99 Mo. 74; State v. Lichliter, 95 Mo. 402; State v. Rockett, 87 Mo. 666; State v. Butler, 67 Mo. 59; State v. Ray, 53 Mo. 349. (b) Motions for new trial on the ground of newly-discovered evidence should be supported by the affidavits of the supposed witness or witnesses. State v. Flutcher, 166 Mo. 587; State v. Bowman, 161 Mo. 88; State v. Nettles, 153 Mo. 464; Sate v. Tomasitz, 144 Mo. 86; State v. Miller, 144 Mo. 26; State v. Campbell, 115 Mo. 391; State v. Musick, 101 Mo. 262. (c) Motions for a new trial on the ground of newly-discovered evidence must show that there has been no lack of diligence on the part of the party seeking the new trial. State v. Bybee, 149 Mo. 635; State v. Lucas, 147 Mo. 70; State v. Fischer, 124 Mo. 460; State v. Musick, 101 Mo. 260; State v. Crawford, 99 Mo. 74; State v. Lichliter, 95 Mo. 402; Snyder v. Burnham, 77 Mo. 52; Shaw v. Besh, 58 Mo. 107; Jaccard v. Davis, 43 Mo.

535; Tilford v. Ramsey, 43 Mo. 410; Callahan v. Caffarata, 39 Mo. 136; Richardson v. Farmer, 36 Mo. 35; Barry v. Blumenthal, 32 Mo. 29. Not a particle of diligence was shown in this case. Gross negligence in preparation for the trial is shown. (d) Newly-discovered evidence which is merely for impeachment is no ground for a new trial. State v. Lucas, 147 Mo. 70; Folding Bed Co. v. Railroad, 148 Mo. 478. (e) Where a motion is filed for a new trial and ten days' time allowed a party for filing affidavits in support of the motion, affidavits filed beyond the period allowed will not be considered by the court. Mirrielees v. Railroad, 163 Mo. 470; State v. Tate, 156 Mo. 119; Bank v. Porter, 148 Mo. 184; Bank v. Bennett, 138 Mo. 494; State v. Welsor, 111 Mo. 570; State v. Brooks, 92 Mo. 545. (f) In motions for new trial, on the ground of newly-discovered evidence, little weight will be given to statements on information and belief. Positive oaths as to the facts are indispensable. 14 Ency. Plead. & Prac., 905.

LAMM, J.—Suit for personal injuries based on the alleged negligence of appellant's servants in operating a street car at the northwest corner of Eighth and Pine streets in St. Louis. The specifications of negligence set forth in an amended petition may be allowed to tell, in their own words, their own story—thus:

"Plaintiff states that on the afternoon of January 12, 1901, he went to the corner of Eighth and Pine streets, in said city of St. Louis, for the purpose of taking one of defendant's cars to convey him to his home. He stood on the northwest corner of Eighth and Pine streets on the west side of Eighth street, and as one of the cars at the time in possession of and operated by the defendant came west on Pine street, the plaintiff signaled to the motorman to stop said car. In response to said signal, defendant's operators and employees in charge of said car did stop the same to allow the plain-

tiff to get on. Plaintiff thereupon, without delay and with due care on his part, proceeded to board said car, and put his right foot upon the lower step of the back platform of said car, and got hold of the hand-rail of said platform, and was in the act of putting his other foot upon the step of said car, when the defendant's employees in charge of said car carelessly and negligently and without warning, caused said car to plunge violently forward and proceeded on its way, without waiting for the plaintiff to get a safe and firm footing upon the said car. Plaintiff states that the violent and unexpected start which the defendant's employees carelessly and negligently caused said car to make, without waiting for plaintiff to get a safe and firm footing upon said car, was of such character as to throw the plaintiff off the lower step of the back platform of said car, and did throw him off of said lower step and precipitated him violently to the granite pavement on said street with such force as to," etc.

The general issue alone was tendered by the answer.

The cause being tried to a jury, and plaintiff having closed his case, defendant asked no demurrer, no peremptory instruction, and produced no testimony— standing mute save the following prayer was offered by it and granted by the court:

"The court instructs the jury that it does not devolve upon the defendant to explain or account for plaintiff's injury, but on the contrary the burden is on the plaintiff to show to your satisfaction that his injuries occurred to him as the direct result of defendant's negligence.

"You are further instructed that negligence cannot be presumed against defendant, but plaintiff is required to prove the same to your satisfaction, and if he has failed to so prove such negligence, your verdict must be for defendant."

For plaintiff, the following instructions—to be commended as models of everyday simplicity, legal precision and comprehensiveness, wherein the candle held up to the jury was in no wise hid under a bushel of verbiage—were allowed, over the objections of defendant and exceptions saved:

"1. If the jury find from the evidence that on the 12th day of January, 1901, the defendant was a carrier of passengers for hire by street railroad and used the railway and car mentioned in the evidence for such purpose, and if they further find from the evidence that on said day the defendant's employees in charge thereof stopped the car mentioned in the evidence at the west crossing of Eighth street on Pine street in the city of St. Louis for the purpose of receiving the plaintiff as a passenger upon said car, and that while said car was so stopped the plaintiff was in the act of stepping upon the steps of said car to become a passenger thereon and defendant's employees in charge of and operating said car carelessly and negligently and without warning caused said car to be started forward before the plaintiff had a reasonable time to get upon said car and to a place of safety and that thereby the plaintiff was thrown upon the street and injured, and if the jury further find from the evidence that defendant's servants in charge of said car by the exercise of the highest degree of care which would have been used by careful and skillful street railroad employees under like circumstances could have prevented such movement of said car at such time and thereby have averted the injury

to plaintiff and failed to do so, and if the jury further find from the evidence that the plaintiff while in his attempt to board said car was exercising ordinary care for his safety in doing so under the circumstances shown in the evidence, then the plaintiff is entitled to recover.

''2. The court instructs the jury that, if under the evidence and instructions of the court you find in favor of plaintiff, you should assess his damage at such an amount as you believe, from the evidence, will be a fair compensation to him for the pain of body and mind, if any, which he has suffered, occasioned by his injuries in question, and for such pain of body and mind, if any, as in all probability he will suffer in the future, occasioned by such injuries, and for such permanent injury, if any, to plaintiff's thigh, as you may find was occasioned by said injuries, and for such loss of earnings, if any, as you may believe from the evidence he has suffered in consequence of said injuries, or will in all reasonable probability suffer on account of said injuries, if any, and for such reasonable actual expenses, if any, which he has incurred for surgical and medical treatment, but the total damages which you may allow plaintiff must not in any case exceed the sum of twenty-five thousand dollars.''

The foregoing instructions were supplemented, on the court's own motion, by one allowing nine jurors to make a verdict, and thereupon ten jurors signed and returned a verdict for plaintiff assessing his damages at fifteen thousand dollars, on which verdict a judgment was entered, motions for a new trial and in arrest filed and overruled, due exceptions saved, and the cause brought here for review.

In effect, the assignments of error presented may be formulated as follows:

1. That the court erred in giving instruction numbered 1.

2. That under the pleadings and evidence plaintiff was not entitled to recover.

3. And that the court erred in overruling the motion for new trial. (And herein of a ruling of the court on a petition to appoint a special commissioner to take depositions in support of said motion.)

4. That the verdict is excessive.

The facts of the case essential to an understanding of the questions presented will appear presently in connection with a consideration of the foregoing assignments of error in their order.

I. The first and second assignments of error, as presented by appellant's counsel, are substantially one and the same, distinguishable only by being stated in a different way by the use of different words, and may be disposed of together.

Did the court err in giving respondent's instruction numbered 1? We think not. Was respondent entitled to go to the jury? We think so. Because:

The specified negligences were not only abundantly proved by the testimony of respondent and of his eyewitnesses, but that testimony stands unassailed by countervailing proof. The record shows there is a granite pavement where the accident occurred; that it happened toward six o'clock, at dark of a Saturday, on the 12th of January, 1901; that a drugstore stands on the corner of Eighth and Pine; that it was lighted up and the street lamps were going at the time; that respondent went to the northwest corner of Eighth and Pine streets, stepped off the curb and there signaled one of appellant's approaching, westbound, electric passenger cars to stop, intending to take passage home; that, apparently obeying the signal, the car stopped; that when it was at a standstill respondent undertook to enter, and while in the act of so doing he put his right foot on the lower step of the

rear platform, caught the hand-rail with his right hand and was swinging himself up, reaching for the upper step with his other foot, and while in this precarious position the car gave a sudden forward lurch, breaking respondent's hold of the hand-rail, whereat he tried to catch hold with his left hand, but, failing, was unbalanced and thrown to the granite pavement and seriously hurt—the car going its way and leaving him prone and dazed, if not unconscious. While signaling the car to stop and when it stopped and while he was in the act of getting on, respondent saw no motorman and no conductor, but he got a fleeting glimpse of a solitary passenger, then a stranger and subsequently remaining unknown to him.

In this condition of the record, it is contended by appellant's counsel that the relation of carrier and passenger is not shown to exist, that as no motorman and no conductor were seen by respondent, the mere coincidence of the signal to stop, followed by the stop itself at the corner in question, does not show that the stop was made in pursuance of the signal or for the purpose of letting a passenger on, nor does it show that the passenger was seen in the act of getting on, or that his attempt to board the car was known. In the absence of all this proof, appellant says, no negligence can be predicated of the lurch causing the fall and injury of respondent, and, therefore, instruction numbered 1 should have been refused, and, further, there was no case for the jury under the pleadings and evidence.

It will be seen from the instruction that the degree of care demanded of appellant is the stringent degree of care required of a carrier when the relation of passenger and carrier exists—a degree of care defined by the books as "the utmost care and skill which prudent men use and exercise in a like business and under similar circumstances." [Jackson v. Railroad, 118 Mo. l. c. 224.] Before such degree of care can be given to a

192 sup—14

jury to regulate the conduct of street car operators, the case must be one where the relation of passenger and carrier exists, which relation can spring into existence only by contract, express or implied. [Schepers v. Railroad, 126 Mo. 665.]

But the law is not so narrow as to conceive of, nor the eyes of the law so dim as to see, the relation of carrier and passenger only when a person is actually on board the car. To the contrary, the law deems that relation to exist when one may be, and treats one as a passenger who is, properly on the steps leaving the car or properly on the steps entering a car as a passenger. [Clark's Street Railways (2 Ed.), sec. 3; Schepers v. Railroad, 126 Mo. supra.] The author above, in the section given, says: "It is well settled that a person does not have to be actually on a street car before he becomes entitled to the rights of a passenger. If the car has been stopped on being signaled, and he is in the act of getting aboard when the car starts, the relation of carrier and passenger is held to be established. It is not necessary, moreover, to get further than to have one foot on the step of the platform or running-board." And the text is supported by a wealth of case law. [See also, Barth v. Railroad, 142 Mo. 535, and authorities cited in respondent's brief.]

And Booth (Booth on Street Railway Law, sec. 326) formulates the proposition under consideration as follows: "The duty of a common carrier does not extend to the personal safety of one who is not actually a passenger. But it is not necessary that there should be an express contract to constitute the relation of carrier and passenger, nor that there should be a consummated contract. It may be implied from slight circumstances, and may arise before the payment of fare or entry into the car. The existence of the relation depends largely upon the intention of the party at the time that he enters, or while attempting to enter. . . . Where a person intends to take passage on a street car

and has hailed it for that purpose, and it has been stopped to enable him to enter, he is to be regarded as a passenger while he is in the act of carefully and prudently attempting to step upon the platform."

So that, speaking generally, it may be said that where there is an implied invitation to enter a street car arising from its stopping at a place required by ordinance for passengers to enter, or implied by its stopping at a place where it is customary for it to receive passengers, or implied from its stopping on the signal of one desiring to ride as a passenger, followed by an attempt to enter the car by placing a foot on the steps thereof, the relation of passenger and carrier is held by all the authorities to exist, and, in applying that law here, it may be further said that the facts of this case bring it precisely within the rule.

It is true respondent saw no motorman or conductor, but, notwithstanding his failure to see either, both, or a motorman acting in the dual capacity of motorman and conductor—some operatives belonging to the *genus homo, sapiens*—were aboard and managing that car, unless it be assumed to have been moving under the (if we may be allowed the word) unthinkable condition of running itself. When Crusoe saw human footprints on the sands of Juan Fernandez and concluded therefrom that men had visited the isle, the soundness of his judgment is intuitively and spontaneously allowed by all his rational friends, schoolboy or grown. So here, when the act of stopping in response to a signal is conceived to be an act of human intelligence—footprints, so to speak—the conclusion that a motorman was present is irresistible and conclusive. If present, he is presumed by the law to be at his post of duty, and further presumed by the law to be performing that duty.

Assuming then, that the motorman was on the car and giving effect to the testimony, to-wit, that a signal was given for the car to stop and that it did stop, one of two conclusions, in the absence of evidence that

it stopped for other purposes, irresistibly follows, viz.: that the car had reached its usual place required by ordinance or by usage for the entrance of passengers and stopped on that account for them to enter; or, that the motorman saw the signal and, as a matter of grace in that particular instance, stopped to permit the would-be passenger to enter—either of which conclusions is fatal to appellant's contention. In this case there is no evidence that any ordinance existed requiring the west-bound car to cross Eighth street and stop at the northwest corner of Eighth and Pine, nor is there any evidence that such spot was a usual place to enter the car, but there is unquestioned evidence that, standing at the northwest corner of Eighth and Pine where light from the drugstore and street lamps would necessarily make respondent visible to an approaching motorman, and where it was so light that eyewitnesses some distance away saw the whole transaction, respondent signaled the car to stop and straightway the car did stop. Neither courts nor juries are permitted to cast to the winds their common sense, and the jury trying this case might naturally infer from a signal to stop and a stopping that the signal and the stopping bore the relation of cause and effect, i. e., that the signal was seen, comprehended and acted upon by those in charge of the car.

In our opinion, there is not a particle of merit in appellant's insistences that (1) there was no case to go to the jury or (2) that instruction numbered 1 was erroneous. In fact, by asking no peremptory instruction and by not demurring to the evidence, appellant came dangerously near admitting below that there was a case to go the jury, and here, comes dangerously near violating that rule of appellate procedure requiring a case to be tried on appeal on the same theory it was tried below.

The assignments of error under consideration will be disallowed.

II.   Barring for the moment the question of the amount of damages, was the motion for a new trial well taken on the grounds presented? We think not.   That motion, in addition to the conventional grounds, was based on the affirmation that the verdict was the result of fraudulent evidence in that respondent represented himself as deprived of the power of natural locomotion and required the use of crutches to move about.   That to give color of truth to such evidence respondent appeared at the court room at all times moving about in the presence of the jury using crutches.   That the use of said crutches was not necessary to respondent and that he could dispense with said crutches   and had power to use his legs and feet in the natural way, all of which has been discovered by appellant since the trial.   Again, that while in the jury room and considering their verdict, several members of the jury induced other members to sign the verdict by reciting alleged instances of the negligent and reckless misconduct of appellant as a carrier of passengers, all of which were entirely outside the evidence and improperly persuaded members of the jury and inflamed their prejudice and passion against appellant and resulted in the verdict for $15,000.

The motion was sworn to by Mr. Palmer, the general claim agent of appellant, who says that he has "read the above and foregoing motion for a new trial and that the matters and things therein set forth as grounds for a new trial in said cause are true as I verily believe."

On application made, appellant was allowed ten days to file affidavits in support of its motion.   Under this leave, on the 2nd day of June, 1903, and in due time, appellant filed affidavits of Nay and Bearden. Nay was the proprietor of the drugstore at the corner of Eighth and Pine, and the purport of his affidavit was merely that respondent, after his injury, came into his store alone and unassisted, claiming that he was in-

jured and saying that "he had fallen off the car or was pushed off, he did not know which." The point to this affidavit is that respondent testified on the stand that he was rendered unconscious or dazed by the violence of his fall to the pavement, that he was unable to rise or walk, and that others assisted or carried him into said drugstore, and that the injury occurred as hereinbefore narrated, and by other witnesses the same facts were shown.

By the affidavit of Bearden it was shown that he was a member of the jury and he deposed that the general misconduct of appellant in other instances, in nowise connected with the case on trial, was detailed to the jury by members thereof.

On the 5th day of June respondent, under leave, filed counter-affidavits of Dryden, Barret, Geist and respondent himself. These parties were all witnesses for respondent and in effect they reiterated their sworn evidence at the trial tending to contradict affiant Nay.

Thereafter, on the 5th day of June (after leave to file affidavits had expired), appellant filed a petition or motion for the appointment of a special commissioner to take depositions, as follows:

"Comes now the defendant, by its attorneys, and shows to the court that on the 18th day of May, 1903, upon the trial of the above-entitled cause, a verdict was rendered against defendant in favor of the plaintiff in the sum of $15,000.

"That thereafter, on the 22nd day of May, 1903, defendant filed in this court its motion for a new trial, and for grounds for said motion it was alleged, among other things, that the verdict was grossly excessive and was founded, as defendant verily believed, upon false and fraudulent evidence offered by and in behalf of plaintiff as to the nature, extent and probable future consequences of plaintiff's alleged injuries, in that said plaintiff upon the trial testified and represented that his alleged injuries were of such character as to de-

prive him of power of natural locomotion and required him to resort to the use of crutches in order to move about, and in support of which testimony and representation and in order to give color of absolute truth thereto, said plaintiff at all times during said trial made use of his crutches in going to and from the court room and in moving about said court room in the presence of the jury; whereas in truth and 'in fact said crutches were not absolutely necessary and plaintiff could at the time of said trial dispense with such crutches, and then and still has the power to use his legs and feet in the natural way, all of which was discovered by defendant since the trial. And as another ground for a new trial defendant alleges misconduct on the part of the jury while considering of their verdict in that several members of the jury and of those who had signed the verdict improperly induced other members of said jury to sign said verdict by reciting alleged instances of negligence, recklessness, and misconduct of this defendant as a carrier of passengers, entirely outside of any evidence in this case, and improperly induced and persuaded other members of the jury to sign the same by improper arguments and exhortations intended and calculated to inflame passion and prejudice on the part of the said jury against this defendant and in order to induce other members of said jury to render an excessive verdict in said case.

"Your petitioner would further represent that upon the 23rd day of May, 1903, this honorable court granted defendant ten days in which to file affidavits in support of its said motion for a new trial. That immediately thereafter defendant proceeded upon its investigation of the facts which had been reported to it since the trial of the case as set forth in its motion for a new trial and ascertained it to be a fact that while the jury was considering of their verdict in said case, different members of the jury related in detail various alleged acts of misconduct on the part of the operators

of defendant's cars and made inflammatory and preju-
dicial arguments based upon such alleged misconduct
on the part of defendant's operatives wholly outside of
any proof which had been offered in support of defend-
ant's claim.

"Your petitioner would further represent that only
one of the parties possessed of such knowledge will give
to defendant a voluntary affidavit proving said facts,
but the defendant is advised and believes it to be a fact
that if authorized to take depositions in support of its
motion for a new trial, it can abundantly verify said
allegation of misconduct on the part of the jury con-
tained in said motion.

"Your petitioner would further represent that the
plaintiff immediately after the rendition of the verdict
in said cause was seen walking without difficulty and
without the aid of his crutches, but that the witness who
so saw said plaintiff declines to give a voluntary affida-
vit proving said facts, and your petitioner is advised and
believes the fact to be that if an order is granted by this
court authorizing the defendant to take depositions in
support of its motion for a new trial it can fully prove
that plaintiff was not incapable of walking without the
aid of crutches as he testified and represented to the
jury, but that such representations so made to the jury
were false and fraudulent and made for the purpose
of securing a verdict to which the true facts did not en-
title him.

"Wherefore, the defendant in the above-styled
cause prays the court for an order appointing a com-
missioner to take the depositions of such witnesses as
either defendant or plaintiff may desire in support or
in opposition to said motion for a new trial, and at such
time and place as to the court may seem proper."

The foregoing motion was supported by the affi-
davit of Cavanaugh, another claim agent of appellant,
who states that he has had charge of the case of Den-
nis Devoy v. St. Louis Transit Co. for the purpose of

securing testimony in support of defendant's motion for a new trial; that he has read the motion for the appointment of a commissioner and that the statements therein contained are true according to his best information and belief.

The court refusing to appoint such special commissioner, appellant excepted, and assigns error of such ruling.

On the 6th day of June, respondent filed three affidavits from jurors Ambler, Bemis and Smith, stating in substance that juror Bearden refused to join in the verdict for $15,000, but wanted to render a verdict for $1,600. That the other juror, Roeder, who did not sign the verdict, proposed to render a verdict for $6,500. That the ten remaining jurors stood for various sums ranging from $10,000 to $20,000, and that "after considerable quiet, gentlemanly discussion the ten jurors concluded that $15,000 would be fair and just." Furthermore, that no juror made any statements to any matter or thing bearing upon the evidence not testified to by witnesses at the trial, but confined themselves strictly to that evidence and instructions given by the court.

On the 8th day of June respondent filed four additional affidavits of jurors, to-wit, Beardsley, Barsachs, Becker and Spencer to a similar effect.

The material questions on the record, related to the point now up, may be considered the following:

*First,* the affidavit of Nay.

*Second,* the affidavit of Bearden. And

*Third,* the ruling of the court upon the petition to appoint a special commissioner to take depositions.

Referring to the affidavit of Nay it will be seen at a glance that no diligence whatever is shown in procuring his testimony. It is an A B C proposition that diligence is a prime condition precedent to the granting of a new trial upon the ground of newly-discovered testimony. [State v. McKenzie, 177 Mo. l. c. 716.]

The record shows that appellant had notice, from

the petition and otherwise, of the location of the accident and that Nay's drugstore figured as the place into which respondent was carried at once on his injury. If not before that, then at the trial the unconscious or dazed condition of respondent caused by the shock of his fall and the result of his injuries, to-wit, his inability to walk, were disclosed. Why was not Nay subpoenaed at the trial? It is not alleged that his name was unknown or that his place of residence was unknown or that he was outside of the jurisdiction of the court or that appellant made any effort to find him. In the absence of such diligence, this offer of newly-discovered testimony was ineffective as a ground for a new trial.

It was ineffective on another ground. In view of the overwhelming contradictory testimony of respondent and several witnesses on the point in hand, Nay's naked statement is not so material that the court could say it would probably produce a different result at a re-trial. On this ground, if on no other, it was properly rejected. [State v. Carpenter, 182 Mo. 53, and cases cited.]

We are the more constrained to the foregoing views, because the affidavit of Nay does not directly touch the question of the constant use of crutches by respondent. The allegation in the motion to the effect that their use was simulated is not sustained. Nor is it pretended that the use of such crutches for a year or more openly on the streets of St. Louis was not visible and could not with diligence have become known to the argus-eyed agents of appellant. Thereby appellant should have been forewarned that respondent leaned on a crutch in his case, and prepared on the issue.

It will not be necessary to consider Bearden's affidavit as an original proposition. Our decisions are rich with learning showing solid reasons for the aversion of courts to allow the impeachment of a verdict by affidavits of jurors lifting the veil of the jury room, dis-

closing its secrets and perpetuating its animosities. See, for example, Pratte v. Coffman, 33 Mo. l. c. 77, *et seq.,* and a current of authority following that case. Not only so, but in this case the counter affidavits of his fellow jurors weigh down and submerge his. [State v. Rush, 95 Mo. l. c. 206.]

This brings us to the consideration of the petition or motion for the appointment of a special commissioner. The occasion of this anomalous motion is somewhat based, *arguendo,* upon the disclosures of the record to the effect that respondent made no claim for damages until several months after his injury; that thereupon in making his claim he mentioned no witnesses; that on being asked by appellant for his witnesses he declined to give their names; that the names of respondent's witnesses, except in one instance, were never known to appellant until it was confronted by those witnesses on the stand at the trial; and that he did not sue for a year and a half after his injury.

It seems that respondent, a lawyer, had adopted a rule in damage suits not to disclose, to corporate defendants, the names of the witnesses sustaining any claim he might have against them and in this instance he applied his own rule in his own case. Whether his refusal to disclose the names of witnesses resulted from fear that they might be tampered with (see Judges 14: 18) or over-persuaded or cajoled into making *ex parte* sworn statements, which through inadvertence might be incomplete, is not disclosed and may only be guessed at—the record excuse was that it would "annoy" his witnesses. But the whole question involved is merely one of correct ethics rather than one of law. It might be that it would be well to have a statute requiring a litigant to disclose the names of all his witnesses to the opposite party precisely as he is now required to produce books, papers and documents. In that event a porate street railway defendant would be compelled, on application of an injured party, who may have been

a stranger to everyone present on the car, to arm such injured party with the names of all witnesses gathered by its skilled and industrious claim agents and known to it, who were present and saw the transaction or could give any information—a valuable right, indeed, under circumstances easily to be imagined. But in the absence of any such law, equally applicable to both parties litigant, we are not prepared to hold that a plaintiff, who out of caution or timidity, or say, selfishness, refuses to disclose the names of his witnesses to his opponent, thereby suffers the penalty of having his judgment set aside. Indeed, the learned counsel for appellant do not go that far, and the matter is injected into the case somewhat as a make-weight or coloring matter.

In the present condition of the law the fact that a claimant concealed the names of his witnesses on application for them might, under proper circumstances and at the very utmost, go to the jury for what it is worth on a question of good faith, or a simulated claim, precisely as it was allowed to go to the jury in this case, to be used later to point or feather an argument.

But a perfect solution of the trouble appellant complains of was in its hand. The deposition of respondent could have been taken timely and he could have been compelled to uncover his witnesses. No effort to take his deposition was shown. On the other hand, appellant seemed satisfied to jauntily approach the ordeal of a hearing with courage and confidence, though only armed with the scant information it had, and it may not now be allowed to make a wry face at the result, or expect its lamentations over its lack of preparedness to coerce or persuade the judicial mind.

The uniform practice has been to try out questions of fact on a motion for a new trial on affidavits. This practice grew up largely from convenience. If a court, having once given suitable time to the trial of a case, was compelled, on incidents arising subsequent to the judgment, to have another trial on the motion for a new

trial, grave abuses would naturally arise and an enormous consumption of time result. Nevertheless, if a witness was claimed to possess important facts he would not disclose on an *ex parte* affidavit, no good reason is apparent why such witness on a motion for a new trial pending, may not be summoned by subpoena and compelled to testify orally, if called within the leave granted by the court. In this case such plan was not adopted, but an application was made to the court for the appointment of a special commissioner to take depositions and this, too, after the leave to file affidavits had expired—a startling innovation on our practice, the need of which is not apparent, and if the precedent were allowed and the practice established, it would be "more honored in the breach than in the observance."

Without denying the lower court the inherent power to appoint a commissioner under extraordinary circumstances appealing to its discretion, yet in this instance the court properly overruled the application and put of record its disapproval of the plan, and with its disposition of the matter we are entirely satisfied.

The motion for a new trial, barring, as said, from present consideration the question of excessive damages, was properly overruled.

III. The verdict is a heavy one and, hence, challenges the sharpest scrutiny. At the outset it may be said that no punitive damages are asked, nor is there any allegation in the petition that the injury was accompanied by willfulness and malice. Respondent's recompense must, therefore, be limited to his actual damage. Three elements contribute to that damage, to-wit, loss of income, medical outlays, pain and physical infirmity.

The evidence discloses that respondent is an attorney nearly seventy years of age. His career, his qualifications and earning capacity at the bar are told rather quaintly and with naivete, by himself, as follows. "I was admitted first in 1861, but we had a con-

test though at that time and I did not commence prac-
ticing until about 1866, or '7." Continuing, he said
that he was practicing in the city of St. Louis, and then
the following occurred:

"Q. Will you state to the jury what you have been
able to do in the way of earning anything in your pro-
fession since you were hurt? A. I cannot sit quietly
in any one position. I couldn't begin to read or write
an hour if you gave me a dollar a second, without mov-
ing.

"Q. What have you been able to earn? A. Not
a penny. Not a dollar have I earned since I have been
injured.

"Q. Will you kindly state to the jury what you
were able to earn before you were hurt? A. *That is
just one of those things that I would have to guess at;
I never kept books and when I had a partner, he always
looked after it.*

"Q. I do not suppose a mere guess is competent.
Tell us within what limits. A. Well, in the neighbor-
hood of $2,500 a year.

"Q. It would be at least that? A. I *think* it
would. Yes, *if I could figure it up.*

"Q. Some years it would go very much more than
others? A. Oh, yes; and during the war and after the
war I made large sums of money; after the war when
Senator James S. Green and I were partners, we made
a great deal of money. He and I were law partners;
he and myself and John H. O'Neil were together."

On cross-examination on the question of income
the following occurred:

"Q. You have been a practicing lawyer a long
time in the city of St. Louis. Has your practice not
been chiefly an office practice? A. Yes, sir; it has been
what might be termed a business practice of the law.
In other words, looking after compromises, and seeing
that the case was properly shored up and let somebody

else try the case and look after the book part of it. I never like to sit down. I don't like now to sit down.

"Q. What is usually denominated as an office practice? A. Well, it is not so much that, as it is a business practice. Going out and seeing that your witnesses are got, and seeing that your case is properly brought, and seeing what is the best policy in the case, and all that sort of thing, and then see whether it would be best to try it or settle.

"Q. Since you got out of bed and have been able to get around, about two months after you were hurt, what has your time been engaged in? A. . I have just been sitting around, wherever I could get a quiet resting place, and reading the paper, and going back home.

"Q. You have not attempted to take up practice at all? A. Not a particle. I might say that I have not earned a penny. I don't think I have. I have not earned a ten dollar bill, that is sure.

"Q. You have not tried to, have you? A. I couldn't; I just can't attend to business."

The foregoing is the whole case so far as income is concerned. No books of accounts are shown—a partner once kept books, but no partner is shown to exist. No law office or settled business place or clientele are shown. So far as this case goes, respondent may have had his office in his hat and his office hours between— but no matter about that. His professional income was not earned in the arena of the courts, nor in an office where knowledge of hornbook law is laboriously metamorphosed into proper advice upon intricate business affairs or upon the sharp and confusing vicissitudes of life. Indeed, his former income is a matter of reminiscence and his present income a matter of guess. Nevertheless, it cannot be said that even at three-score and nearly ten, a veteran who could "look after compromises" and could "see that a case was properly shored up" and that the "witnesses were got" and that the "case was properly brought" and what the "best

policy in the case was" and see whether it would be "best to try it or settle" and "all that sort of thing," did not have an earning capacity furnishing a basis for expert testimony or upon which a jury might not place a value. Certain it is, there can be no lawyer in full practice who has not many times and oft seen the time and place where the homely list of duties and abilities inventoried by respondent might not have served a turn, if not for ostentation, at least for use. For who has had no cases that did not need "shoring up," and who has not had cases wherein a live and close question was whether "to try or to settle?" So, too, we may take judicial notice of the fact that the best policy in a case and seeing whether the witnesses are got and whether the case is properly brought are of as deadly import in the evolution of a successful lawsuit as looking after the "book part" of it. Verily these things bear the relation of a hand to a glove, a hook to an eye, a pea to a pod. It will not do then to blandly dispose of respondent's earning capacity with a wave of the hand, or to claim by innuendo that respondent ran for a lawyer and got beat, his earning capacity was an asset lost by the accident, and its value was for the jury, however ambiguous the evidence.

The medical outlay proved was $150, and it was shown to be reasonable.

We will not incumber this opinion with the details of the evidence relating to the extent of respondent's injuries. Suffice it to say that respondent sustained incidental bruises from a violent fall which in the ordinary course of time disappeared and no permanent effect resulted. His chief injury consisted in a fractured thigh bone from which he was laid up several months, because of which he is now compelled to go about on crutches, and the effects of which may well be believed, under the medical testimony at his time of life, to result in permanent lameness, and the consequent pains and annoyances of such an affliction. The immediate

question in hand, then, resolves itself into an inquiry whether for a fractured hip and an outlay of $150 for medical services and a loss of income of the character proved, $15,000 is an excessive verdict?

In Waldhier v. Railroad, 87 Mo. 37, plaintiff was seventeen years of age at the time of an accident whereby his right foot and left leg were crushed so that both had to be amputated. At the first trial he was allowed $8,000. The case was reversed, and on second trial he recovered $25,000. There was an inference from the evidence that plaintiff was able to earn a livelihood. Plaintiff offered a remittitur of $5,000. This was allowed, and the judgment affirmed for $20,000.

In Furnish v. Railroad, 102 Mo. 438, the damages were $15,000. Plaintiff's spinal column was injured. There was evidence that the injury was permanent; that she suffered pain intermittently; that she was not able to walk before or at the time of the trial; had left the house but once since the accident and then was carried out in the fresh air, but was so pained that she could not go again; that she was fifty-three years of age; and that she was examined by defendant's experts who did not give the jury the benefit of their observations. This court reduced the verdict by $5,000.

In Burdict v. Railroad, 123 Mo. l. c. 236, the injuries were the loss of the left hand. Plaintiff was thirty years old and was a brakeman. The testimony showed the arm was of no use to him, was cold all the time in winter and bothered him all the time. Verdict for $12,-500. The court below required plaintiff to remit $2,500. This court required a further remittitur of $3,000, leaving the judgment stand at $7,000.

In Nicholds v. Plate Glass Co., 126 Mo. l. c. 68, at the first trial plaintiff was allowed $15,000. In a second trial he recovered $8,666. The bones of his ankle were broken; he used crutches five or six months and then an apparatus consisting of iron braces and a cork bot-

192 sup—15

tomed shoe; he lost seven or eight months time and was earning $75 to $90 per month at the time of the accident. The evidence showed that one of the bones was thickened. Only the half sole of one foot rested on the floor; the strength of the leg was impaired and the evidence indicated the injury was permanent. This court cut the judgment down to $5,000.

In Rodney v. Railroad, 127 Mo. 676, the judgment was $12,500. Plaintiff was twenty-eight years of age, a strong healthy man earning $100 per month. His arm was terribly mashed between the elbow and shoulder, necessitating the amputation of the arm thirteen days after the accident, the whole arm being then rotten and the bone fractured. Erysipelas set in. There were spent for medical attention $200 and plaintiff suffered "intense pain" and "unspeakable agony." A remittitur was ordered for $2,500, but a majority of the Court in Banc being of the opinion at that time that the court had no power to require a remittitur, the judgment was affirmed.

In Hollenbeck v. Railroad, 141 Mo. 112, the plaintiff was between thirty-two and thirty-three years of age, in the vigor of manhood and earning $65 per month. His left leg was crushed below the knee, necessitating amputation. It was amputated three times, the last time above the knee. He was in the hospital for six months and his suffering was long and severe. The jury gave him $10,000. The trial court gave its approval and this court, while admitting the verdict to be large, held it had no power to require a remittitur under the authority of Rodney v. Railroad, supra.

In Chitty v. Railroad, 166 Mo. l. c. 443, plaintiff was fourteen years of age. No former earning capacity was shown. His present earning capacity was not entirely destroyed. He used crutches and remained in a hospital for several months. Seven years after the injury he still suffered pain and his wound was not entirely healed, but suppuration ensued and his leg was constantly

kept bandaged. The injury was a compound comminuted fracture, that is, the bone was broken in more than one place and protruded through the soft parts of the skin. The injured leg is shorter than the other, but plaintiff could walk with the aid of a stick. The judgment was for $15,000, on a second trial. A remittitur was ordered here for $5,000.

In Markey v. Railroad, 185 Mo. l. c. 365, the verdict was for $35,000. Before the accident plaintiff was a fine type of a man; forty-five years of age and proficient at his trade, a locomotive engineer. He lost both legs by amputation and was pinned down with the weight of an engine bearing on the lower part of his legs for two hours or more until he could be taken out. In that case a remittitur of $15,000 was required.

In Stolze v. Transit Co., 188 Mo. 581, the plaintiff was eighteen years of age at the time of the accident; was earning $3 a week and board and washing; was eleven months in the hospital; medical and surgical services were $500; his right leg had an open compound fracture and on his left leg he suffered a compound comminuted fracture. In the left leg the bones protruded through the skin; his pains, keen and agonizing, continued for several months; his left leg is shorter than the other; his ankle was anchylosed; the bones are still coming out; the injuries were permanent; the right leg entirely recovered. The judgment was for $15,000 and it was reduced by this court to $8,000.

In Reynolds v. Transit Co., 189 Mo. 408, the verdict was for $23,400. Plaintiff was forty-two years old, in the prime of life, strong and healthy and weighing 195 pounds. He was thrown to the side of a car, his back striking the edge of the seat; has never been able to walk since; has lost forty or fifty pounds of weight; must constantly take purgatives to move his bowels; has diabetes; has paralysis of both his legs and has manifestations of progressive nervous decay; was a helpless cripple with little hope of any improvement.

In that case this court considered $15,000 a fair compensation and required a remittitur of $8,400.

We are cited to no Missouri case where for a fracture of the hip at the age of plaintiff, and the incidental losses shown by this record, a judgment for $15,000 was permitted to stand. We think it excessive and under the practice established, both upon reason and precedent, we will require a remittitur of $5,000. This will leave a substantial judgment for this old-time, crippled barrister—in our judgment, a full compensation.

If, therefore, respondent will remit $5,000 within thirty days, the judgment will be affirmed for $10,000; otherwise, it will be reversed and remanded for a new trial.

All concur, except *Brace, P. J.*, absent.