JOHN C. BUMGARDNER v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation, Appellant.—102 S. W. (2d) 594.

Division Two, March 11, 1937.

522

*T. E. Francis, B. G. Carpenter* and *Allen, Moser & Marsalek* for appellant.

*Earl M. Pirkey* and *Robert L. Maul* for respondent.

524

BOHLING, C.—The St. Louis Public Service Company, a corporation, prosecutes this appeal from a $10,000 judgment in favor of John C. Bumgardner for damages sustained by reason of a collision between one of appellant's street cars and an automobile operated by respondent. The case reaches the writer upon reassignment.

Manchester Avenue is an east and west street and Tower Grove Avenue is a north and south street in the city of St. Louis. Appellant maintains and operates a double track street railway service along Manchester Avenue at the point involved in this proceeding. Appellant's north track is used for westbound traffic and the south track for eastbound traffic. The south rail of appellant's south track, ten feet west of Tower Grove Avenue, is eighteen feet three inches north of the south curb of Manchester Avenue. Tower Grove Avenue at its intersection with Manchester Avenue is sixty feet wide. The grade of Manchester Avenue is practically level immediately west of its intersection with Tower Grove Avenue. The evidence on behalf of respondent established that January 26, 1931, was a clear day, and appellant's tracks were dry; that about eleven-thirty A. M. of said day respondent was operating a Hudson service sedan eastwardly along Manchester, at a speed of approximately twenty miles an hour, and approaching Tower Grove; that respondent passed an eastbound street car of appellant's, traveling four to five miles an hour, approximately three hundred or three hundred and fifty feet west of Tower Grove and as he approached Tower Grove he swerved to the north to avoid an automobile "double parked" or parked a few feet north of the south curb on Manchester, going over on or near to appellant's south track; that thereafter respondent continued straight east toward Tower Grove; that the traffic signal at Tower Grove changed from "Go" to "Stop" when respondent was fifty to seventy-five feet from Tower Grove; that respondent stopped his automobile within six or seven feet of the crosswalk; that the traffic signal changed

every thirty seconds; that there was no obstruction to appellant's motorman's view of said automobile; that, after respondent's automobile had been standing at the intersection from fifteen to twenty-five seconds, it was struck on its left rear bumper and body by the street car, knocked, according to the testimony, "cater-corner" across Tower Grove to the southeast corner of the intersection, striking a light pole and a Ford coupe, on which the brakes were set, and forced the coupe forward about six feet and against the rear of a standing Ford truck, damaging the rear doors of the truck. The testimony also established that at the time respondent's automobile came to a stop prior to the collision the street car was some distance west, variously put by witnesses up to two hundred feet or more, traveling east fast, its speed being estimated at twenty and twenty-five miles an hour, and, if loaded, could have been stopped in from seventy to eighty feet with safety. The motorman testified the street car was traveling between fifteen and twenty miles an hour and was stopped within forty-five feet; that ordinarily it would take fifty feet to stop under the existing conditions, and that if he had been traveling at a slower rate of speed the stop could have been made in a shorter distance. One witness testified the street car came to a stop about the center or a little past the center of the intersection. There was also testimony that one of appellant's supervisors was riding on the platform with the motorman; that they were talking, and that the street car did not slacken its speed up to the time it struck the automobile.

Appellant's version of the collision is to the effect the street car and respondent's automobile were approaching the intersection; that a few seconds elapsed for the change of the traffic signal from "Go" to "Stop;" that the motorman was within twenty-five feet of the intersection and intending to cross when respondent's automobile, with a clear road ahead, suddenly cut in front of the street car; that about this time the traffic signal changed from "Go" to "Traffic Change" and respondent stopped the automobile, which was then about fifteen feet in front of the street car, and that the motorman was unable to stop the street car before striking respondent's automobile.

■■ Appellant first mentions error in the court's failure to sustain its demurrer at the close of all the evidence. Appellant does not attempt to develop the assignment as one involving a lack of substantial evidence to support respondent's allegations of negligence but, stating respondent's evidence was so inconsistent and self-destructive as to leave him without substantial evidence, proceeds, without the further development of the issue, from a discussion of the assignment relating to the demurrer to an assignment urging prejudicial and reversible error in the giving of instructions authorizing

recovery upon alleged wholly inconsistent and repugnant theories of liability and in said assignment the purported inconsistent and repugnant instructions are attacked, not on the ground of any lack of substantial evidence to support either submitted theory of recovery but, wholly upon the alleged inconsistent and repugnant theories of recovery embodied in the two instructions.

Respondent's Instruction 1 authorized a recovery under the humanitarian doctrine on the theory appellant negligently failed to stop the street car before it struck the automobile and respondent's Instruction 2 authorized a recovery under primary negligence on the theory appellant operated the street car at a negligent rate of speed, said theories of negligence being within the allegations of respondent's petition. Appellant contends the two instructions are inconsistent and repugnant in that Instruction 1 authorized the jury to return a verdict for respondent if they found that after plaintiff was in imminent peril the motorman, by the exercise of ordinary care, could have stopped the street car before it struck the automobile and thereby have avoided the collision, and that his failure to do so was the proximate cause of plaintiff's injuries; whereas, Instruction 2 authorized the jury to return a verdict for plaintiff if they found that the car was being operated at a speed of about twenty miles per hour and that its operation at such speed proximately caused the collision, upon the theory that by operating the car at such speed the motorman had negligently disabled himself from stopping after the peril arose. Appellant cites Crews v. Wilson (Div. Two), 312 Mo. 643, 651(2), 281 S. W. 44, 46(2), and Elliott v. Richardson (Mo. App.), 28 S. W. (2d) 408, 410(2). We think these cases are to be differentiated from the instant case by the facts and issues presented. The Elliott case relies on the Crews case. In the Crews case the deceased ran as fast as he could from within two or three feet behind an eastbound street car, being two or three feet west of the front and five or seven feet south of a passing westbound street car when the motorman of said westbound car first saw him, and was struck and killed by the westbound car. The ultimate ruling in the Crews case was that plaintiffs "were only entitled to go to the jury, if at all, under the humanitarian rule . . ." [312 Mo. l. c. 654, 281 S. W. 44.] If so, plaintiffs in the Crews case, for some reason, failed to make a submissible case on any pleaded issue of primary negligence; and the remarks therein regarding plaintiffs' refused instruction on primary negligence (operation of the street car without having the same under control) being inconsistent with their humanitarian instruction are redundant. That the Crews case was not undertaking to pass upon the precise issue of repugnancy presented in the instant case is apparent from the following language of said opinion [312 Mo. l. c. 653, 281 S. W. 44]: "The petition does not charge the

defendant with negligence in running the car at an excessive rate of speed and, hence, an issue of that character was not admissible under the pleadings.'' The Elliott case was not one where the plaintiff relied merely upon negligent speed and negligence under the humanitarian doctrine; as is the instant case.

Under the facts adduced by respondent in the instant case, his automobile having been parked for fifteen to twenty-five seconds within the range of vision of appellant's motorman, it stands established that the motorman, notwithstanding the excessive speed of the street car, had ample opportunity, under the humanitarian doctrine, to avoid the collision by stopping said car before striking respondent's automobile. The humanitarian doctrine seizes upon a situation as it exists at the time the peril becomes imminent. If the street car was being operated at a negligent rate of speed, such primary negligence on the part of appellant extended the danger zone under the humanitarian doctrine; for appellant's street car, if traveling at a slower or nonnegligent rate of speed, could have been stopped, as testified to by appellant's motorman, in a shorter distance. The rate of speed affected the distance in which the street car could be stopped and the instant the humanitarian doctrine seized upon the situation. Given a negligent rate of speed prior to the humanitarian rule seizing upon the situation, the fact that notwithstanding such speed the humanitarian doctrine becomes applicable to the situation does not, by reason of its application, make such antecedent negligent rate of speed (thereafter continued in the instant case) a nonnegligent or lawful rate of speed. To so hold would preclude a recovery for primary negligence based upon proven negligent speed (which might continue to the very point of impact) if the facts of the case be such as to permit of the application of the humanitarian rule notwithstanding such primary negligence. On the other hand, if a peril suddenly arises after a moving object passes that point along its approach to the point of impact (in the instant case approximately forty-five or fifty feet according to appellant's motorman) where it is impossible on account of the negligent speed to stop and avoid the collision, a defendant is not liable under the humanitarian doctrine for a failure to stop although possibly liable for primary negligence. [Farrar v. Metropolitan St. Ry. Co., 249 Mo. 210, 217(1), 155 S. W. 439, 441(1). See Williams v. St. Louis Pub. Serv. Co., 335 Mo. 335, 345(9), 73 S. W. (2d) 199, 203(10); Taylor v. Metropolitan St. Ry. Co., 256 Mo. 191, 210(2), 165 S. W. 327, 332(3); White v. St. Louis & M. R. Railroad Co., 202 Mo. 539, 558, 101 S. W. 14, 20(b).] The submitted theories of recovery were not inconsistent or repugnant under the facts of the instant case.

Plaintiff's Instruction 3 told the jury that if they found Man-

chester and Tower Grove avenues were open public streets in the city of St. Louis, then "the defendant was not entitled to the exclusive use of said Manchester Avenue" at the vicinity involved, and that it was appellant's duty to exercise ordinary care in the operation of its street car and to be on the watch for vehicles on or approaching appellant's eastbound track. Appellant contends the instruction is an abstract statement of law and comments on the evidence. It is urged the statement appellant was not entitled to the exclusive use of Manchester Avenue, the subject matter not being in issue or disputed, was harmful. The relative rights and duties of operators of street cars and citizens traveling on the streets of a city have been the subject matter of discussion in the adjudicated cases of this State [Latson v. St. Louis Transit Co., 192 Mo. 449, 457(1), 91 S. W. 109, 111(1), and cases cited]; and the giving of practically identical instructions has been held not reversible error [Williams v. United Rys. Co., 335 Mo. 335, 347(11), 73 S. W. (2d) 199, 204(12); Parrish v. United Rys. Co. (Mo.), 260 S. W. 748, 750(3); James v. United Rys. Co. (Mo. App.), 236 S. W. 1089, 1092(4). See *arguendo* Hoelzel v. Chicago, R. I. & P. Ry. Co., 337 Mo. 61, 71(5), 85 S. W. (2d) 126, 130(9); Hults v. Miller (Mo. App.), 299 S. W. 85, 89(9).] The instruction might well be phrased to eliminate the main objection lodged against it in this and other cases and still inform the jury of the legal right of respondent to be on the street and the legal duty of appellant to look out for vehicles on or approaching appellant's said track.

██ Appellant contends the verdict is grossly excessive in that (1) there was no substantial showing that the collision brought about any injury of a permanent nature to respondent and (2), in no view of the evidence, is an award of $10,000 justified.

Respondent testified he had suffered no material injuries to his person on any occasion other than in the collision here involved and had been in good health. He was forty-nine years of age, five feet seven inches tall and heavy for his height, weighing at the time of the trial two hundred and sixty-four pounds. His business, so far as disclosed by the record, was the operation of a service car. Shortly after and at the scene of the collision respondent became sick, suffering from a severe pain in the back of his head, neck and back and required assistance. He was taken to his home, where he was confined in bed six weeks. After about nine weeks he tried to operate a service car, working possibly half of the time for three months, and finally, on account of his back, made no attempt to work after the fall of 1931. Respondent testified that other than a "knot" on the right side of his head, which disappeared in a week or so, he suffered no bruises or other objective evidences of injury; that at the time of trial he had no pain in the back of his head and neck, but

his back still hurt him, although perhaps not so severely as when he quit working in the fall; and that if he exerted himself to any extent he could hardly get up when down. The opinion of medical experts was offered by each party. The underlying cause of respondent's main complaint is arthritis of the spine of the hypertrophic type— a proliferation of the cells. Such condition is permanent in nature. It is commonly caused by the absorption of toxic poison. Respondent adduced evidence that his arthritic condition was caused by an injury. Appellant's experts testified it could not be caused by trauma, although an injury might cause such a condition to manifest itself in pain which, were it not for the arthritis, would clear up within several months; and that respondent's arthritis was of several years standing. Appellant, relying principally upon Adelsberger v. Sheehy, 332 Mo. 954, 958(2), 59 S. W. (2d) 644, 646(3); Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 603, 66 S. W. (2d) 561, 564(4-6), and other cases to the effect expert testimony that a given cause might, could or would produce a given injury is of insufficient probative value to establish that the cause did produce the injury, contends respondent's evidence does not establish the necessary causal connection between appellant's negligence and said underlying cause of respondent's condition.

Respondent received medical treatment from Dr. Charles Harral while confined to his bed, and for about three or four months subsequent to August 12, 1931, Dr. Albert E. Snow treated him for the condition of his back. Dr. Harral did not attempt to state the cause of respondent's condition, but considered it permanent. Mr. M. G. Houghton, who examined respondent shortly before the trial, testified there was evidence of compression of the intervertebral cartilaginous discs of and some degeneration of the nerves leading from the lower spine, which condition he considered permanent, and that it was reasonably probable the collision produced said condition. Dr. Snow testified:

"Q. [Speaking of the treatments administered.] What effect does that treatment and the galvanic and the static altogether usually have on cases of violence to the back? A. It relieves the conditions if they are not too severe. Q. Now, with these treatments, what effect did they have on Bumgardner's back? A. They done him an immense amount of good for the time he was taking the treatments; he improved steadily at that time, but later on, upon my next examination of May 20, [1932] I found the condition had returned— that is, quite a lot of it. Q. What is his actual condition right now? A. His actual condition at the present time is that his soreness and stiffness of those parts are of such a character that he isn't able to get around and do any amount of work. Q. Is that a permanent condition? A. It is. Q. Will that cause him pain in the future?

A. It will. Q. Is there any way of curing that? A. I don't think so. Q. Now, do the X-rays show anything, doctor? A. The X-rays show hooks upon the spinous process, shows the fibrous deposits which we call, of course, fibrous arthritis. Q. What causes that? A. Well, arthritis may be caused from toxic conditions of the body, may be caused from—in most cases where they localize themselves they are most generally caused from injury of some kind. Q. What was the cause of it in this case? A. It is my opinion that there has been an injury. . . . Q. Did you find anything present other than violence which would account—injury or violence, which would account for his condition? A. I did not. Q. Now, doctor, will you show us the X-ray or X-rays which show the condition of the spine which you mentioned? A. Now, what we have reference to, we mean these here growths here, these horns, you can see them if you look close, you will see some of the protuberances off of here. Q. Are they on a natural spine? A. No. Q. In your opinion did this injury cause them? A. Yes. Can you see those hooks like that? The Court: Just show what they show, doctor. The Witness: That is all; they show those hooks.'' Dr. Snow also testified that the condition of respondent's teeth would not result in the absorption of toxic poison in sufficient quantity to produce respondent's arthritic condition. On cross-examination he testified that he could not tell how long respondent's arthritis had existed; that it was impossible to give its exact duration; and that from the X-ray pictures it might have existed prior to January, 1931, but that was not probable. We think Dr. Snow's opinion, based on his treatment and examinations of respondent, that respondent's arthritic condition was the result of an injury or violence (it being established respondent had suffered no injury other than the one here involved) and was not due to the absorption of toxic poison within the body, was substantial evidence, the weight of which was for the jury [Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 603, 66 S. W. (2d) 561, 564(4)]; and his testimony on cross-examination that it was not possible to tell the exact duration of respondent's condition from the X-ray pictures and that respondent might have had arthritis in January, 1931, but it was *not probable*, does not possess such substantive probative value, under the Adelsberger and Kimmie cases, supra, as to constitute contradictory and conflicting testimony detroying the probative value of his evidence in chief [See Adelsberger v. Sheehy, 332 Mo. 954, 961(5), 59 S. W. (2d) 647(6)]. Nor upon the showing made in the instant case are we prepared to say Dr. Snow's testimony may be disregarded.

However, we are of opinion the verdict is excessive. In addition to any damages arising from respondent's physical injuries, the **jury** were authorized to take into consideration respondent's medical ex-

penses and the damages to the automobile in amounts not exceeding $190 and $460, respectively. At the time of the trial respondent had fully recovered from the effects of the collision with the exception of the condition of his back, the pain being localized between the waist line and the hips and which, according to respondent, was perhaps not as severe as formerly. The collision resulted in no bruises to respondent's back. A couple of months after the accident he was able to be up and around. There is no showing of record of respondent's earning capacity. Although the treatments administered by Dr. Snow did respondent an immense amount of good and his condition improved steadily while he was taking them, from Dr. Snow's testimony that he found on the examination of May 20, 1932, much of respondent's former condition had returned, it is to be inferred that respondent's discontinuance of said treatments and inattention to his physical condition contributed to the severity of his principal and only complaint at the time of the trial. There is no fixed rule for determining the amount of damages to be awarded in a given case, but it is obvious the size of the instant verdict was reached on the theory appellant's negligence was the sole cause of respondent's present complaint and the permanency thereof. Such is respondent's position here. Under the facts and circumstances involved and giving respondent the benefit of all substantial evidence and legitimate inferences therefrom, but not strained or unwarranted inferences, insofar as they may affect the amount of the award, we are of opinion a judgment for more than $7,000 ought not be allowed to stand.

If within ten days respondent will enter in this court a *remittitur* of $3000, the judgment will be affirmed for $7000 as of the date of the original judgment; otherwise, the judgment will be reversed and the cause remanded. *Cooley* and *Westhues, CC.,* concur.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the court. All the judges concur.