SECORD FISHER, (Plaintiff) Respondent-Appellant, v. OZARK MILK SERVICE, INC., a Corporation, (Defendant) Appellant-Respondent. —No. 39917.—201 S. W. (2d) 305.

Division One, March 10, 1947.

Rehearing Denied, April 21, 1947.

96

*Everett Hullverson* and *Alfred I. Harris* for plaintiff-appellant; *Orville Richardson* of counsel.

*Wayne Ely* for defendant-appellant Ozark Milk Service, Inc.; *Everett Hullverson* and *Alfred I. Harris* for respondent-appellant Secord Fisher; *Orville Richardson* of counsel.

 DALTON, C.—Action for damages for personal injuries alleged to have been caused by defendant's negligence. Plaintiff obtained a verdict for $10,000 and defendant was granted a new trial "as to the liability only." Both parties have appealed.

On September 3, 1945, about 1 P. M., plaintiff was riding as a guest in the rear seat of a 1938 Ford automobile (two door sedan), which was being driven east on Taft Avenue in the City of St. Louis. He was severely injured when defendant's 2½ ton International truck, being operated south on Virginia Avenue, collided violently with the left rear side of the automobile. Other facts will be stated in the course of the opinion.

Only one assignment in the defendant's motion for a new trial was sustained, towit, that "the court erred in submitting the case to the jury on the theory that defendant had violated the humanitarian doctrine, and on the further theory that defendant was guilty of primary negligence, as set forth in Instructions 1 and 3 . . ." All other assignments were overruled.

Instruction 1 submitted defendant's negligence in failing to slacken the speed of the truck, stop it or swerve it to the right and avoid the collision after discoverable peril arose. Instruction 3 submitted primary negligence, towit, defendant's failure to provide the truck with two sets of adequate brakes, kept in good working order as required by an ordinance of the City of St. Louis. Plaintiff insists that the court erred in granting a new trial on the ground stated, while defendant contends that a new trial was properly granted, as to liability, because Instructions 1 and 3 were unsupported by evidence, the two instructions were inconsistent, and Instructions 4 and 5 were erroneous. Defendant further contends the court erred in refusing a new trial on the issue of damages because the verdict was grossly excessive, instruction 9, on the measure of damages, was erroneous and the court erroneously refused to declare a mistrial on account of improper argument.

Virginia Avenue has a downgrade to the south, while Taft Avenue is slightly upgrade to the east. Both streets are 35-40 feet wide and black top paved, except that on Virginia there is a double set of street car tracks with brick paving from outside rail to outside rail. The streets were dry and the sun shining. Plaintiff's witness, Ramey, the owner and operator of the Ford, testified that he entered the intersection at 10 or 12 miles per hour, with the left side of the Ford 20 feet from the north curb line of Taft; and that when the front of his car was at the west curb line of Virginia, he saw defendant's truck 75 to 85 feet north of him, 55 to 60 feet north of the intersection, with

its left side near the center of Virginia and approaching at 15 or 20 miles per hour. There was no other traffic and, since the truck was approaching from his left and he had the right of way and was reasonably sure he "could beat" the truck, he "stepped on the gas," increased his speed to about 15 miles per hour, and proceeded. When he looked towards the truck again, it was within 6 feet of the Ford—with the driver of the truck about even with the front seat of the Ford. The collision occurred when the front of the Ford was within 6 or 7 feet of the east curb of Virginia. The truck hit the Ford immediately back of the left door, caved in the left side and left rear fender, and turned it completely around. The truck crossed to the south line of the intersection.

Ramey said the truck didn't increase speed, but that "from deductions" it must have increased its speed; that the Ford traveled 30 or 35 feet at 10 or 12 miles per hour, after he first saw the truck, and less than half the distance the truck traveled. "The truck got faster," perhaps to 20 miles per hour. To have reached the point of collision, with the Ford's increase of speed to 15 miles per hour or a little less, the truck would have had to increase its speed to 25 or 30 miles per hour, "maybe that could have happened." He thought it must have happened, otherwise he should have cleared the path of the truck. When he first saw the truck, he was 7 to 10 feet west of the west curb line of Virginia, and the Ford moved only 12 to 15 feet, until some part of it was in front of the truck. About half of the length of the Ford had cleared ▮▮ the path of the truck before the collision. The center point of the collision occurred 17 feet out in Virginia Avenue. All distances were estimates as he took no measurements.

Mr. Weeks, a passenger in the Ford, testified for plaintiff that the Ford entered the intersection at 10 miles per hour and maintained that speed; that, when the front wheels of the Ford were on the west rail of the southbound street car track and 10 or 12 feet east of the west curb of Virginia, he saw the truck 35 to 40 feet to the north approaching at 20 miles per hour; that the truck did not swerve or slacken speed; and that, between the time he first saw the truck and the moment of the collision, the Ford had moved 20 feet farther east. Mrs. Weeks said the truck was, perhaps, 15 feet away when the front of the Ford was over the first street car rail.

Defendant's driver, Ogle, a witness for defendant, testified he was going south on Virginia, astraddle the west street car rail, at 15 miles per hour, and when he was 4 feet into the Taft Avenue intersection, he saw the Ford come out of Taft Avenue, traveling about 30 miles per hour and he (Ogle) "hit the brakes" and no more than he hit the brakes he hit the Ford. He "wouldn't say for sure" that the truck entered the intersection first, but when the nose of his truck was at the north curb line of the intersection, the Ford was a little bit

west of the intersection, and the automobile ran across 5 or 6 feet in front of the truck. "The truck was stopped just as it hit the car about. Maybe it might have went a foot or two past where I hit the car." It didn't hit the Ford hard enough to knock it completely around. He slackened speed at the time he put on his brakes. On cross-examination he said he didn't see the Ford until it was in front of him, 4 feet, or 4 or 5 feet away, about in the middle of the street, where it was hit. He "saw it just a little bit" before he hit it. He wasn't looking the way the Ford entered, but was looking at a motorcycle which had stopped, headed west, on Taft Avenue on the east side of Virginia. He looked to the right, when he was about 5 feet from the north curb line of Taft. The first time he saw the Ford, the "whole car itself was into Virginia past the curb line."

The truck was equipped with vacuum hydraulic brakes, with a booster "that makes them better than just ordinary hydraulic brakes." They stop very fast. The truck was in "good condition." Ogle "wouldn't say" the brakes were "in perfect condition, but they were in pretty good condition. Good enough to stop it, but not that quick," not within 5 or 6 feet at 15 miles per hour. He stopped at different places that day. The brakes worked all right—stopped it all right. They "were down a little ways, but not enough to hurt." Would make some difference in stopping, "maybe a foot or two." He didn't have to press twice before they really took good action, because he "drove them touch type." There was no leakage of any kind in the brakes. "All it needed was the shoes needed setting out at the drums. That kept the pedal from going all the way down." That would make them hold better and you could stop faster, but "not very much." At 15 miles an hour with "those vacuum hydraulic brakes" he could stop that truck in "5 or 6 feet, something like that," "I imagine so", "about as far as from here to that table," about 10 feet. The brakes should have been adjusted and he was "going to have that done." There was no evidence concerning the presence or absence of other brakes.

One Williams claimed that he inspected the brakes four days before the collision and found them in "fair" working condition, would lock the wheels when the pedal was 1¼ inches from the floor. To be safe the pedal must stop one inch from the floor. He said he could bring "a two and one-half ton International truck to a stop from 15 miles per hour, on a dry street like Virginia "with the brakes in good condition," in 15 feet and, at 20 miles per hour, in 20 feet.

■ Defendant contends that there was no evidence the truck could have been turned to the right, or that if it could have been, the collision could have been avoided; and that it was physically impossible for the collision to have occurred under the facts (speeds and distances) stated by Ramey. ■ Defendant further says "there was no evidence in the record as to the distance within which the truck

could have been brought to a stop with the brakes in the condition they were in at the time of the collision and no evidence as to the distance required to stop from a speed of thirty-five miles per hour.''

Williams did give stopping distances for such a truck with ''good brakes'' at speeds of 15 and 20 miles per hour. Ogle fixed the stopping distance for this truck with ''these brakes'' at 15 miles per hour and fully described the brakes and made comparisons. There was further evidence showing the distance within which the truck was stopped on this occasion. The maximum speed of the truck that could have been inferred from the evidence was not so far removed from 20 miles per hour that the jury could not have determined stopping distances from the evidence before it.` The evidence concerning the difference between ''these brakes'' and good brakes was not such that the jury could not determine stopping distances at these speeds with the brakes on the truck at the time of the collision. Specific and direct evidence was not required where the evidence was such that the required inferences could be drawn.

Considered favorably to the plaintiff, the evidence shows that the Ford entered the intersection in plain view of the approaching truck. The truck was then 75 to 85 feet away, with its left side near the center of the street. The Ford moved directly into the path of the truck at a speed of 10 or 12 miles per hour and did not decrease its speed. When the front wheels of the Ford reached the west rail of the southbound tracks the truck was 35 to 40 feet away and mov-- ing at 20 miles per hour. A violent collision occurred. Plaintiff was in discoverable peril prior to the time the Ford reached the path of the truck and when the truck was a sufficient distance away to have been stopped with the appliances at hand. The conflicts in the estimates of speed, distances and stopping distances were for the jury. Plaintiff was not bound by Ramey's testimony in view of the testimony of other witnesses. The Ford was in motion and lacked only 6 or 7 feet of clearing the path of the truck. The collision happened near the center of the intersection and there was no other traffic. Only a slight slackening of speed or swerving to the right, possible under the evidence, would have avoided the collision Substantial evidence supports every one of the constitutive elements of the humanitarian doctrine on every issue submitted by Instruction 1. Wright v. Spieldoch, 354 Mo. 1076, 193 S. W. (2d) 42; Teague v. Plaza Express Co., 354 Mo. 582, 190 S. W. (2d) 254.

Were the charges of negligence submitted by Instructions 1 and 3 necessarily inconsistent, conflicting and contradictory? We need not determine whether substantial evidence supports Instruction 3. Plaintiff contends that discoverable peril arose while the defendant had time, distance and *ability* to stop with bad brakes; that humanitarian negligence in not stopping or slackening speed concurred with defendant's subsequent *inability to stop* on account of negligence

in having bad brakes; that the charges of negligence are not necessarily inconsistent; that both charges are supported by one consistent state of facts showing primary and humanitarian negligence; that proof of one charge did not disprove the other; and that there was no error in submitting both charges to the jury. Plaintiff further says that "if the object struck was over 15 feet away when the brakes were applied, then the defective condition of the brakes was a proximate cause of the collision." Plaintiff contends that, if the brakes could have been adjusted so as to make a difference of "maybe a foot or two" in stopping, the jury could find that, the "additional distance required because of defective brakes was the difference between horrible injury and safety." Plaintiff argues that "Ogle actually saw the Ford while still far enough away to stop with good brakes, and failed in his belated attempt because of bad brakes"; and that "if the brakes had been in good condition when applied 17 feet from the collision they would have stopped the truck 2 feet short of the collision." Plaintiff relies upon cases holding that a charge of negligent failure to stop under the humanitarian doctrine and a charge of negligent speed are ▮▮▮ not necessarily inconsistent, as where the unlawful speed was not such that the operator of the vehicle could not have stopped after discoverable peril arose. Williams v. St. Louis Public Service Co., 335 Mo. 335, 73 S. W. (2d) 199, 203; Haley v. Mo. Pac. R. Co., 197 Mo. 15, 93 S. W. 1120. Also, Hillis v. Home Owners' Loan Corp., 348 Mo. 601, 154 S. W. (2d) 761, 765 (unlawful speed and failure to slacken speed). Plaintiff says that defective brakes have the same effect as excessive speed in that a longer distance is required for stopping.

Of course, an automobile may be moving at a rate of speed that under the circumstances (or by ordinance) is negligent, and still the driver may be able, by the exercise of the highest degree of care, to stop it (after discoverable peril) and avoid a collision. In such case the negligent speed and the negligent failure to stop could both operate as concurring causes at the moment of collision. In this case Instruction 1 predicated a verdict upon *ability* to stop or slacken speed and avoid the collision after discoverable peril arose, while Instruction 3 predicated a verdict upon *inability* to stop due to defective brakes. One necessarily submitted failure to stop when the driver *could stop,* as the proximate cause of injury, while the other submitted failure to stop when the driver *could not stop* because of bad brakes. The ability to stop with defective brakes necessarily terminated before the inability to stop on account of defective brakes began. Ability and inability to avoid the collision did not exist at the same time. We think that Instructions 1 and 3 were mutually inconsistent. Proof of the facts hypothesized by one, as a direct and producing cause of the injury necessarily disproved the facts hypothesized by the other as the producing cause of the injury. The

two submissions are mutually inconsistent and could not be true at the same time. The court did not err in granting the new trial. Crews v. Wilson, 312 Mo. 643, 281 S. W. 44; Elliott v. Richardson (Mo. App.), 28 S. W. (2d) 408; Tunget v. Cook (Mo. App.), 84 S. W. (2d) 970 (writ of certiorari quashed, State ex rel. Tunget v. Shain, 340 Mo. 434, 101 S. W. (2d) 1). It will be unnecessary to consider other assignments by defendant in support of the order granting a new trial on the issue of liability. The matters complained of as objectionable may be avoided on a retrial of the cause.

▌ Did the court err in refusing a new trial on the issue of damages? Plaintiff was 78 years of age, and was seated on the left hand side of the rear seat of the automobile, immediately adjacent to the point of collision. His head struck and broke the glass in the car window and partly extended out of the window after the crash. He was taken to a hospital where he remained for five weeks. His head was severely bruised and he had a rather serious concussion, or brain injury without demonstrable fracture, but evidenced by impaired mental condition. For sometime he was "flighty", his talk "misjointed", and he had an idea he had had a mix-up with horses. He suffered from "traumatic neurosis." This condition improved some, but "the future is doubtful." He had six major comminuted fractures of the pelvic bone (two affecting the thigh bone socket), a fracture of the left collarbone, and two fractured ribs. The pelvic injuries caused loss of control of the bladder and paralysis of the bowels for several weeks and plaintiff's stomach was distended. He was placed in a fracture bed for four weeks and had to have sedatives every night for awhile. The pelvic fractures will never entirely heal, they are permanent, but there has been a fiberous union. His injuries will intensify an arthritic condition in his back, causing traumatic arthritis. On account of his grave condition after the collision, his collarbone was not set, but was permitted to heal with overlapping, or complete displacement, resulting in some deformity and loss of use. The rib fractures have healed with a ⅛ inch displacement in one rib. Plaintiff's mental condition was good before his injury and, outside of an asthmatic cough, he was in good physical condition, particularly for his age. The cough is a little more pronounced now. His injuries are such that he will never be able to get on and off street cars, move about the streets or do work of that character. ▌ His mental condition at times will not permit him to keep books or make purchases. He will require medical attention and care in the future. He has complained of some pain, and now has pains in his leg and back. His back hurts when he gets up. At times he has dizzy spells and soreness in his back. He can't sleep with his legs stretched out flat because of pain. The effect of all his injuries will be to shorten his life. He won't be able to manage his own affairs or "manage a lot of little things he formerly probably could." He

uses crutches at home, but appeared in court with a cane. He had done absolutely nothing from the time of injury to the time of the trial. (Loss of future earning and medical expense is discussed later). In view of plaintiff's physical injuries, resulting physical condition and other losses, the verdict is not excessive. Age alone is not controlling. Devoy v. St. Louis Transit Co., 192 Mo. 197, 221, 91 S. W. 140, 148; Brucker v. Gambaro (Mo. Sup.), 9 S. W. (2d) 918, 922; Hill v. Montgomery, 352 Mo. 147, 176 S. W. (2d) 284, 288.

Instruction 9 authorized the jury in assessing damages to allow plaintiff reasonable compensation for "loss of earning, if any, . . . plaintiff is reasonably certain to suffer in the future . . . on account of said injuries . . . not exceeding the sum of $100 per month . . . and "for such medical attention and hospital care plaintiff has received . . . not exceeding sum of $850 on this item."

About six years before the date of the collision, plaintiff's niece Mrs. Gerber and a Mr. Carroll purchased a building in St. Louis and plaintiff, with the two others, operated a boarding and rooming house on some type of partnership basis, but with no employees. Plaintiff fixed rent rates, collected rent, laundry and phone calls from tenants, deposited the money received, paid the bills, took care of the furnace and hot water heater, assisted in buying groceries and supplies, dealt with the O.P.A., made ordinary repairs about the building and prepared and filed income tax returns. At one time plaintiff had been a railroad auditor and later a traffic manager. Plaintiff received his board, clothes and a share of the partnership income, which was divided three ways, but with no regular distribution or withdrawals. Plaintiff fixed the value of his earnings at $75 to $100 per month. After he was injured, the other partners did his part of the work.

Defendant contends the evidence fails to show that plaintiff "is reasonably certain to suffer any future loss of earnings," particularly since the partnership is still in existence, the partners have the same tenants they had before plaintiff was injured and no reduction of income or increase of expense was shown. Defendant says that mere conjecture or likelihood, or even probability of loss of future earnings will not sustain an allowance of damages.

In view of plaintiff's disability, which has totally incapacitated him to date and will reasonably incapacitate him in the future, the jury could infer and find that plaintiff will suffer a loss of earning in the future, whether in or out of the partnership. It is not reasonable to believe that the partnership will continue indefinitely under present circumstances, or that, if it does, the partnership, with one partner seriously incapacitated, will continue to earn as much as when plaintiff was actually contributing thereto. The evidence was sufficient to support the instruction on the issue of loss of earnings in the future. Byars v. St. Louis Public Service Co., 334 Mo. 278, 66 S. W.

(2d) 894, 903(11); Taylor v. Terminal Railroad Association of St. Louis (Mo. App.), 112 S. W. (2d) 944, 948(3). .

■ Did the instruction erroneously permit the jury to assess damages for medical attention and hospital care "without requiring the jury to find plaintiff had incurred or become obligated for any such expense?" Defendant cites De Moulin v. Roetheli and Kroger Groc. & Baking Co., 354 Mo. 425, 189 S. W. (2d) 562, 568 (instruction directing verdict for specified amount); Robertson v. Wabash R. Co., 152 Mo. 382, 390, 53 S. W. 1082 (absence of evidence and error in admission); and Duke v. Mo. Pac. R. Co., 99 Mo. 347, 351, 12 S. W. 636 (no evidence of value or attendant circumstances). The cases are not controlling. Dr. John A. Konzelman was ■ engaged in general practice, as a physician and surgeon. He was "called to treat" plaintiff at the City Hospital and had plaintiff removed to the Deaconess Hospital. Dr. Konzelman had charge of plaintiff's case, as "attending physican," and $350 to $400 was "a reasonable charge" for services rendered plaintiff. Plaintiff's total bill for care at the Deaconess Hospital was $399.75. Statements were issued from time to time. Plaintiff was not physically able or mentally competent to look after the payment of the bills and Mr. Carroll attended to their payment. The evidence shows that the medical attention and hospital care, if any, was furnished to and received by plaintiff under such circumstances as the law would imply an obligation to pay its reasonable value. McDaniel v. Chicago, R. I. & P. Ry. Co., 338 Mo. 481, 92 S. W. (2d) 118, 121; Gentili v. Dimaria (Mo. App.), 89 S. W. (2d) 93, 97. If the jury found that the medical attention and hospital care, as shown by the evidence, was in fact *received* by plaintiff they could properly allow damages to reasonably *compensate* him for the medical attention and care so received. The instruction was not erroneous.

■ Defendant says "the court erred in refusing to declare a mistrial because of improper argument, and in refusing to reprimand plaintiff's counsel, or to take other steps to overcome the prejudicial effect of the improper argument." Defendant insists that it didn't have a fair trial and attribute the amount of the verdict to prejudicial and improper argument resulting in a verdict so excessive as to show prejudice and passion and requiring reversal.

Space does not permit a full discussion of the assignment, but a careful reading of the whole record shows that the difficulty complained of arose out of Mr. Hullverson's attempt to reply to Mr. Ely's argument to the effect that the jury could not allow plaintiff anything for loss of future earnings unless it was "reasonably certain," plaintiff's "guardian angel," Mr. Carroll, was going to "kick him out" of the partnership arrangement. Defendant's counsel asked the court to reprimand counsel for making a certain statement objected to and to declare a mistrial. The court directed the jury to disregard the statement and denied other relief. Some other requests were

110

refused. Under all of the facts and circumstances shown by the record, no prejudice to defendant appears. The court did not abuse its discretion by the rulings complained of.

The order granting a new trial "as to the liability only" is affirmed and the cause remanded. *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.