Henry J. SCHAEFER, Respondent,

v.

Sam RECHTER, Defendant,

and

Rechter Bros., Clothing Co., Inc., a corporation, Appellant.

No. 44819.

Supreme Court of Missouri.

Division No. 2.

April 9, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied May 14, 1956.

Walther, Hecker, Walther & Barnard, George W. Cloyd, St. Louis, for appellant.

Berthold & Bialson, St. Louis, for respondent.

EAGER, Presiding Judge.

This is a suit for personal injuries in which plaintiff had a verdict for $10,200 against the corporate defendant and it has appealed. The parties will be referred to as they appeared below. Defendant asserts that the verdict is excessive by $10,000, primarily because the trial court submitted, as an element of the damage, heart conditions which developed after the original injury, and which, allegedly, were not caused thereby. A suitable withdrawal instruction was offered and refused.

Plaintiff was unloading parcel post packages at the dock of the St. Louis Post Office on January 24, 1953; the Ford panel truck which he drove had been backed to within 5 or 6 feet of the dock and he was working behind it, with the rear door open.

An employee of the defendant, in attempting to back a Cadillac car into an adjoining space, struck the bumper of plaintiff's truck with his own bumper, and with sufficient force to damage plaintiff's bumper and fender. This impact, according to plaintiff's testimony, knocked his truck backward 4 or 5 feet and the "top of the Ford" struck him across the bridge of the nose and the eyes. For the purpose of determining the submissibility of the element of heart damage, we must consider the evidence most favorable to plaintiff. Plaintiff testified that he fell over on the platform, tried to grab it, but missed, hit on the left side of his chest, and in some manner fell back into the truck. He climbed out, and had a "terrific pain" in his left chest, and his nose was bleeding. Nevertheless, he jacked up his bumper so as to release the interlocked bumpers and also jacked up his fender sufficiently to clear the tire. Thereafter, he drove back to his place of business, drove his employer home, and walked four blocks to his own home. About 2:00 P.M. he went to his family doctor, Dr. Otto C. Hanser; he called the doctor's attention to the pain in his chest and arm; the doctor gave him an injection, cleaned out his nose, and sent him elsewhere for X-rays, which were negative. Thereafter, and up to February 24th, he saw the doctor six times. During this period he continued to work, but, he said, with increasing difficulty; his nose remained swollen and he spat blood for about four days; he developed a tingling sensation in his hands; at times he had pains in his left arm and chest, which he described as spasmodic and severe; the frequency of these is not shown, but they always disappeared in 5–10 minutes when he sat down, until about the time he went to the hospital. He said, however, that these were more severe during the week immediately preceding that event, and the doctor told him to take it easy. On February 23rd, Sunday, he had one of these pains which lasted for some hours and he called the doctor to his home. Getting no relief, he was sent to the Veterans' Administration Hospital where he remained for nearly eight weeks. It seems to be conceded that he suffered a coronary occlusion on that day, and it is apparent that his subsequent incapacity stems from that. So far as he knew he had never previously had anything wrong with his heart, and had never had similar pains. He had done no work from February 23, 1953, to the time of trial, October 18, 1954.

Dr. Hanser was plaintiff's sole medical witness. He is a general practitioner, and had practiced approximately thirty-five years. No objections were made to his qualifications. He stated that he did treat heart cases, but called in a specialist at times. He had known plaintiff since 1942, had treated him for miscellaneous ills not material here, and had found nothing wrong with his heart from previous stethoscopic examination. He saw plaintiff on January 24, 1953, and found a contusion or bruise on his left chest from below the nipple line up to his shoulder; he also observed and treated the facial abrasions and bleeding, and found a fast pulse and one-half degree of fever. He gave plaintiff penicillin and an innoculation for tetanus, and ordered an X-ray, which was negative. At that time the doctor thought plaintiff might have a fractured rib. He saw plaintiff thereafter on six occasions up to February 23rd; on some or all of these occasions he complained of recurring pain in his chest, which disappeared with rest. The doctor thought this might be neuritis and treated him for that. At some time in this interim the doctor began to suspect that the heart might be involved and had a cardiograph made, which showed no abnormal reaction. It seems that on February 22nd, the doctor found for the first time what he definitely considered to be an anginal spasm, though he had suspected such before. On the next day, February 23rd, he found the much more severe attack which was diagnosed as a coronary occlusion.

Dr. Hanser testified, largely without objection: that angina pectoris is a spasmodic contraction of a coronary artery or a branch of such artery (they being the vital arteries lying inside the heart itself and supplying blood to the heart muscle);

that such a spasm closes, or almost closes, the artery or branch; that these contractions cause pain, and in his opinion, anginal spasms caused plaintiff's pains; that these spasms result from some condition of the nerves which control the musculature of the arteries, and that they may come on with exertion, excitement, worry, nervous strain, etc., and with or without trauma; that such is a relatively common condition without history of trauma, and that in any event, there is probably an underlying arteriosclerosis (a degenerative, progressive change in the arterial walls); anginal spasms usually pass off in a few minutes, but leave one weak; they cause no organic change in the arteries themselves. However, such a patient must be careful, as he may die in an attack. A cardiograph does not disclose angina unless one is made while an attack is going on, and angina is usually diagnosed from history; the history plaintiff gave was somewhat characteristic of angina, with or without trauma. A coronary occlusion, on the other hand, consists of a clot in a coronary vessel; the witness used that term more or less interchangeably with "infarction." An infarction is demonstrated by cardiograph. The doctor further stated opinions, as follows: that plaintiff's first attack of angina resulted from the trauma in question, and that this attack "sparked off" the subsequent anginal attacks; that he knew of no specific medical authority for that theory, but that he thought almost "any" of the medical books "talk about" recurrent anginal seizures from trauma; (when asked concerning his own experience, he mentioned a case which, at least from the explanation given, was not directly illustrative of the point); that any violent blow can cause angina pectoris and that he "is sure" it did so here; that if anginal attacks recur a number of times they slow the circulation and this finally "culminates in an infarct or coronary thrombosis"; that trauma can cause a coronary occlusion, as in a prize fight, by causing the vessel to spasm; that here "it was all a traumatic thing, from this blow"; and, that the trauma caused the "heart condition, the spasm of the coronary artery and

the condition that the man is in." He did not think that a blow would loosen deposits of "cholesterin" in or on the linings of the arteries. He had advised plaintiff to stop work, but the latter felt that he had to keep on. He had treated plaintiff since he left the hospital, and pronounced him "completely totally disabled from manual labor." His total bill was $200.

Defendant's medical evidence came from Dr. Charles W. Miller, an internist with considerable experience in heart work. We may deal with this very briefly, under these circumstances; his opinions were almost entirely opposed to those of Dr. Hanser. He had examined plaintiff approximately six months before the trial; he found some hardening of the arteries, definite evidence of a previous coronary occlusion and subsequent myocardial infarction (which is the death of that segment of the heart muscle previously supplied by the occluded artery or branch), an autonomic disturbance of the nerves which caused some shoulder-arm pain, and found that plaintiff was then disabled; he thought that plaintiff might well be able to return to work which was not too strenuous, particularly when his shoulder-arm pain cleared up, but this depended somewhat on his future progress and check-ups. This physician was not certain that plaintiff had originally suffered anginal attacks at all; he was certain that plaintiff's disability was due entirely to the occlusion, and that it had no relation to the trauma. He said: that an occlusion causes serious, organic damage, and that perhaps half of the victims suffer immediate death; that it would not be possible for a coronary occlusion to be caused by a trauma which had occurred 29 or 30 days previously; nor would it be caused by any trauma to the chest unless the trauma was sufficient to damage the bony structures and the heart muscle itself. He did not think that trauma could cause more than a single seizure of angina, but did say that: "You can find authors who state that an anginal syndrome might be precipitated by trauma."

Plaintiff's wages had been $56.50 per week prior to his injury. Since defendant only asks a remand on the issue of damages, we need not discuss the evidence concerning liability. Liability in some minor amount is substantially conceded. Lay witnesses for defendant minimized somewhat the extent of the blow to plaintiff's truck, and emphasized the apparent absence of any serious injury to plaintiff at the time. Defendant presented its general motions for a directed verdict, and also alternative motions for a directed verdict on the issue of damages due to the heart condition, the latter on the ground that such were not shown to be the direct and proximate result of the collision. These motions were all denied; defendant then offered an instruction withdrawing that issue from the jury and this was refused. The issue is thus clearly presented here.

Appellant insists that the evidence was insufficient as a matter of law to justify a submission of causal connection between the original injury and the subsequent heart conditions. This position briefly is: that such heart conditions can and do occur frequently without trauma; that the actual injury here was a minor one; that the time lapse thereafter was comparatively long; that Dr. Hanser offered no substantiation from experience or medical authority for his theory that trauma could set off a series of anginal spasms, finally resulting in a coronary occlusion; that he admitted that such a chain of events often occurs without trauma; and, finally, that his testimony did not constitute substantial evidence but was mere conjecture.

Counsel cite, in this connection, cases on three propositions: (1) that this court may determine, as a matter of law, whether expert opinions are sufficiently supported to constitute substantial evidence, Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844; Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 66 S.W.2d 561; (2) that medical opinions to the effect that a certain condition "might or could" be caused by an injury do not constitute substantial evidence, Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 66 S.W.2d 561, 565; Adelsberger v. Sheehy, 332 Mo. 954, 59 S.W.2d 644; Baker v. Kansas City Terminal Ry., Mo., 250 S.W.2d 999; Hunt v. Armour & Co., 345 Mo. 677, 136 S.W.2d 312; Franklin v. Kansas City Public Service Co., 239 Mo.App. 151, 186 S.W.2d 546; Berry v. Kansas City Public Service Co., 341 Mo. 658, 108 S.W.2d 98; Seabaugh's Dependents v. Garver Lumber Mfg. Co., 355 Mo. 1153, 200 S.W.2d 55, and (3) that where the testimony of a single expert is so conflicting in itself that no reasonable conclusion may properly be drawn from it, that evidence is too insubstantial to permit a submission. Adelsberger v. Sheehy, supra; Hoffman v. Illinois Terminal R. Co., Mo.App., 274 S.W.2d 591.

We shall direct our attention largely to the first of these propositions. While Dr. Hanser did state, in some instances, that certain results "could" be caused by certain things, he certainly did not rely on such testimony in his final conclusions; on the contrary he stated very positive and affirmative opinions as to the causation in this particular case. For a somewhat similar situation see: Gillick v. Fruin-Colnon Const. Co., 334 Mo. 135, 65 S.W.2d 927, 930. The "might or could" cases need no further discussion here. Neither do we consider that the testimony of Dr. Hanser embodies any conflict within itself. Counsel apparently rely on his statement that he did not think that trauma would loosen deposits on the linings of the coronary arteries; thus causing a spasm of the artery. In this he merely repudiated that particular theory of the causation of an occlusion, but this in no way conflicted with his oft-repeated theory that trauma did independently set off the series of anginal spasms which finally resulted in the occlusion by forming a blood clot. We are not impressed with the argument that his testimony was self-conflicting, and, therefore, self-destructive.

What has given us much more concern, however, is whether Dr. Hanser's testimony is sufficiently supported to constitute

substantial evidence. His ultimate opinions or conclusions may be divided generally into two parts; first, that the injury precipitated a series of anginal spasms; and, secondly, that these recurring spasms caused the clot or occlusion, and the resulting infarction. As to the first, he gave no really analogous case from his own experience; he said, however, that medical books mention the matter. In this he was to some extent corroborated by defendant's expert, who, while he personally rejected the theory, said: "You can find authors who state that an anginal syndrome might be precipitated by trauma." A "syndrome" is generally a group of symptoms which occur together, but here it seems clear that the witness meant a recurring group of anginal spasms, for that is precisely what he was then being questioned about. On the second conclusion, i. e., the causation of the occlusion, Dr. Hanser relied upon his own explanation that the recurring anginal attacks, each of which constricted and wholly or partially closed the coronary artery or some branch thereof, so interfered with and slowed the circulation that this ultimately caused a clot. This matter really boils down to a determination of whether that opinion constitutes substantial evidence.

The case of Gaddy v. Skelly Oil Co., 364 Mo. 143, 259 S.W.2d 844, urged upon us by defendant, involved the testimony of a supposed expert, primarily a chemist, that the regulator on a cylinder of "bottled gas" was defective; the court expressed doubt as to his qualifications on the particular subject, but declined, on this point, to reverse the trial court. There, however, the testimony of the expert was so inconsistent in itself as to be nearly self-destructive, and we think that a close reading of the opinion will demonstrate this. The questions involved were mechanical ones, where radical misstatements and inconsistencies would be more or less apparent. The situation there was much different from that in our case, where we are considering the medical opinions of a physician whose qualifications have not been challenged. In Kimmie v. Terminal R. R. Ass'n,

334 Mo. 596, 66 S.W.2d 561, the court considered whether or not the medical testimony was sufficient to support a finding that a fall had caused a bone tumor; the expert testimony, however, was merely to the effect that the fall "might or could" have caused it, and this was held to leave the matter entirely in the realm of conjecture. The court further stated the principle that even the opinion of a medical expert must have "reasons and testimony" to support it, which will give it sufficient probative force to be substantial evidence. But, in considering the somewhat ambiguous evidence as to whether the tumor was malignant, the court said that while the opinions of the physicians left the matter in doubt, nevertheless "the opinions of experts based upon examination and treatment is substantial evidence and its weight is for the jury." (Citing various authorities.)

The cases which plaintiff's counsel have cited on this point are not particularly helpful. Among them are cases where the result was, in whole or part, apparent to a layman; thus the plaintiff's own testimony might aid the expert opinion. That is not the situation here, for the causation of malfunctions and organic diseases of the heart are complicated matters on which lay testimony is practically valueless. Coronary occlusions do often occur without any cause which is apparent to laymen.

The following cases illustrate, in some measure, the latitude which the courts have permitted in considering medical opinion as substantial evidence of causation: whether a blow had set up vibrations within the brain, causing hemorrhage and paralysis, Waterous v. Columbian National Life Ins. Co., 353 Mo. 1093, 186 S.W.2d 456; the aggravation of a pre-existing rheumatic heart condition by trauma, Walker v. St. Louis Public Service Co., 362 Mo. 648, 243 S.W.2d 92; whether arthritis was caused by trauma, Bumgardner v. St. Louis Public Service Co., 340 Mo. 521, 102 S.W.2d 594; diabetes from trauma, Green v. Terminal R. Ass'n, Mo. App., 135 S.W.2d 652; the result of trauma on mentality, Erwin v. Railway Express

Agency, Mo.App., 128 S.W.2d 1077; the spread of septicemia by trauma, Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S.W.2d 125; rupture of the spleen by trauma, stated on assumed facts, Krug v. Mutual Life Ins. Co. of New York, 235 Mo.App. 1224, 149 S.W.2d 393; and the aggravation of a pre-existing appendicitis and salpingitis by trauma. Ambruster v. Levitt Realty & Investment Co., 341 Mo. 364, 107 S.W.2d 74, 80, 81. In some of these cases the expert had not seen the patient or treated the condition; in some there seems to be no more supporting data, reason, or testimony than in the present case; and, certainly, in sundry cases the expert has recited no identical case from his own experience and no specific medical authority.

The medical evidence of plaintiff here is certainly not entirely satisfying. This court cannot, however, sit as a jury. No objection was made to the witness' qualifications and he stated definite opinions, with at least some explanations and reasons. We must assume that he was qualified to testify on this subject. We cannot conscientiously say that these opinions were wholly without such supporting "reasons and testimony" as to give them probative force and thus to qualify them as substantial evidence. Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 66 S.W.2d 561. We feel constrained to hold that sufficient causal connection was established to justify the submission of the heart condition as an element of damage.

■ The next contention of error concerns plaintiff's damage instruction, numbered 5. It is claimed that this instruction erroneously permitted the jury to consider future loss of wages, future pain and suffering, and the future duration or permanency of plaintiff's injuries, when there was no evidence to support these elements. The instruction permitted the jury to take into consideration: "* * * such loss of earnings, if any, you may believe and find from the evidence plaintiff is reasonably certain to suffer in the future * * such pain and suffering of body and mind

plaintiff is reasonably certain to suffer in the future * * * the nature, character, extent and probable duration of the injuries, if any, plaintiff suffered * * *."

The evidence was that plaintiff had done no work whatever to the time of trial, a period of one year and nearly nine months, and that he was still under medical treatment. His doctor testified that "he is not able to work," and that he had pronounced plaintiff "completely totally disabled from manual labor"; defendant's medical witness had examined plaintiff approximately six months before the trial and testified that he was suffering from the results and complications of a myocardial infarction following the coronary occlusion, with aching pains and sundry complaints, and that "It is felt that he is disabled at this time and that his ability to resume work is somewhat problematical," depending on his future progress and further examinations; this doctor did say that there was a good possibility that plaintiff could return to work not too strenuous. Plaintiff had lost approximately $4,850 in wages at the time of trial; from this evidence it seemed reasonably certain that he would suffer some loss of future earnings, for an indefinite time, and that he would suffer some pain in the future, also for a rather indefinite period. Perhaps the medical evidence could have been more definite on the future probabilities, but we take it as it is. We cannot hold that this submission was erroneous. Most of the cases cited by defendant concern submissions of the permanency of injuries, where evidence of a "reasonable certainty" is required, Weiner v. St. Louis Public Service Co., Mo., 87 S.W.2d 191; Bante v. Wells, Mo.App., 34 S.W.2d 980; Plank v. R. J. Brown Petroleum Co., 332 Mo. 1150, 61 S.W.2d 328; State ex rel. Kansas City Public Service Co. v. Shain, 350 Mo. 316, 165 S.W.2d 428; in one case the plaintiff was working at the time of trial with no impairment of earning power shown, Williams v. Illinois Central R. Co., 360 Mo. 501, 229 S.W.2d 1, 20 A.L.R.2d 322. If permanency had been submitted here the situation would be different. We think,

however, that the jury could find some future loss of earnings and some future pain without speculation; there was not a failure of proof on these subjects. A consideration of the "duration" of plaintiff's injuries did not necessarily involve permanency; it was substantially equivalent to the other two submissions quoted. The jury, by its verdict, allowed a comparatively modest sum for the future, which certainly did not contemplate permanency. The present question is not one of excessiveness, at all (as counsel for plaintiff indicate), but solely one of the propriety of the instruction. On the propriety of this submission generally, see: Taylor v. Terminal R. Ass'n, Mo.App., 112 S.W.2d 944, 947; Fisher v. Ozark Milk Service, 356 Mo. 95, 201 S.W.2d 305; Costello v. M. C. Slater, Inc., Mo.App., 220 S.W.2d 947; King v. City of St. Louis, 250 Mo. 501, 157 S.W. 498; Sang v. City of St. Louis, 262 Mo. 454, 171 S.W. 347. If defendant considered the instruction too general, it seems that it should have offered a limiting instruction. Wolfe v. Kansas City, 334 Mo. 796, 68 S.W.2d 821, 826; King v. City of St. Louis, 250 Mo. 501, 157 S.W. 498; Murphy v. Winter Garden & Ice Co., Mo.App., 280 S.W. 444; Bishop v. Musick Plating Works, 222 Mo.App. 370, 3 S.W.2d 256; Kleinlein v. Foskin, 321 Mo. 887, 13 S.W.2d 648, 658. We hold that the giving of this instruction was not reversible error.

■ Lastly, appellant claims that the court erred in refusing to declare a mistrial for misconduct of plaintiff's counsel; the misconduct consisted of counsel's use of a document entitled "Clinical Record Narrative Summary" of the Veterans' Administration Hospital, being a signed carbon copy. This had not been offered in evidence at the time. At a recess counsel for defendant had previously declined to agree to its admission, and they insist here that it was wholly incompetent because not an original hospital record, but merely a "summary." Counsel for plaintiff attempted to question his expert witness from this document, referring to it as a copy of the hospital record, and an immediate objection was made. Further discussion then took place, both in and out of the jury's presence, counsel for plaintiff stating that he had offered to let the document go in as a transcript of the medical records, and counsel for defendant insisting that it was a mere inadmissible summary and that the action of counsel was willfully calculated to embarrass defendant before the jury. The matter was concluded by the court's action in sustaining the objection and clearly instructing the jury to disregard the whole incident, including all statements of counsel. While the document is described, at least in part, as a "Narrative Summary," it seems apparent that certain parts of it are actual incorporations of parts of the hospital record. However, it is not necessary for us to rule here whether any part was admissible.

■ A wide discretion is universally allowed to a trial court in such instances. McGinley v. St. Louis Public Service Co., Mo., 239 S.W.2d 321. Of course, it would have been more proper if counsel had had the document marked and had then sought to introduce it as an exhibit. However, the fact that plaintiff had been a patient in the Veterans Hospital for nearly eight weeks, and that he had been discharged as then totally disabled was already in evidence and uncontroverted. Defendant's counsel stated his position rather vehemently and in some detail before the jury, expressly taxing his opponent with unfairness, and insisting that the document was not the hospital record. We do not criticize this, but the jury certainly labored under no misapprehension of defendant's position. Defendant's counsel was also permitted, in argument, to comment on plaintiff's failure to bring in the hospital records; but neither party was allowed to refer to the "Summary," and properly so, we think. We cannot say that under all these circumstances defendant was deprived of a fair trial, as is now contended.

The judgment will be affirmed. It is so ordered.

All concur.